UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WASHINGTON AT SEATTLE

| | |
|---|---|
| GABRIEL MARQUEZ VARGAS,<br><br>Plaintiff,<br><br>v.<br><br>RRA CP OPPORTUNITY TRUST 1, REAL TIME RESOLUTIONS, INC., and NORTH STAR TRUSTEE, LLC,<br><br>Defendants. | Case No.<br><br>DEMAND FOR JURY TRIAL |

## I. PARTIES, JURISDICTION AND VENUE

1. Plaintiff Gabriel Marquez Vargas resides in King County, Washington, and owns and occupies a homestead at 4611 S. 164th St., Tukwila, WA 98188 (the "Property" or the "Home") in King County, which is further described legally as:

THE NORTHERLY 145.00 FEET OF THE EAST 60.00 FEET OF THE FOLLOWING DESCRIBED TRACT: THAT PORTION OF THE NORTHEAST QUARTER OF SECTION 27, TOWNSHIP 23 NORTH, RANGE 4 EAST, W.M., IN KING COUNTY, WASHINGTON, DESCRIBES AS FOLLOWS: COMMENCING AT A POINT ON THE NORTHERLY LINE OF SAID SECTION 27 A DISTANCE NORTH 89º 59'10" WEST 1256.10 FEET FROM THE NORTHEAST CORNER THEREOF; THENCE SOUTH 00º 15'50" EAST 1251.60 FEET TO THE TRUE POINT OF BEGINNING OF THEN TRACT HEREIN DESCRIBED; THENCE CONTINUING SOUTH 00º 15'50" EAST 290.40 FEET; THENCE NORTH 89º 59'10" WEST 150.00 FEET; THENCE NORTH 00º 15'50" WEST 290.40 FEET; THENCE SOUTH 89º 59'10" EAST 150.00 FEET TO THE TRUE POINT OF BEGINNING; (ALSO KNOWN AS A PORTION OF LOT 9 IN BLOCK 14 OF MCMICKEN HEIGHTS DIVISION NO. 2 UNRECORDED.).

Situated in the County of King, State of Washington

COMPLAINT - 1

King County Parcel: 5379802945

More commonly known as: 4611 S. 164th St., Tukwila, WA 98188 ("the Property").

2. The Plaintiff's loan at dispute in these proceedings is a consumer loan because Mr. Marquez used the loan primarily for personal, family, or household purposes.

3. The Defendant RRA CP Opportunity Trust 1 ("RRA CP") organized as a Delaware statutory on or about April 14, 2016. Wilmington Savings Fund Society, FSB serves as the registered agent for RRA CP. Upon information and belief RRA operates from the Real Time headquarters in Dallas, Texas. It owns, or owned, tranches of second mortgages purchased from Bank of America, N.A. and/or Countrywide secured by real property throughout the United States.

4. Upon information and belief RRA CP formed with the primary purpose of acquiring defaulted consumer mortgage debts for pennies on the dollar and to collect on those debts and reap huge profits by conducting foreclosure sales and/or other collection activities for sums far in excess of its investment.

5. Upon information and belief, RRA CP is not registered as a foreign business in the State of Washington with the Department of Revenue, Secretary of State, or licensed by the Department of Licensing as a collection agency.

6. RRA CP, as a debt buyer, is a debt collector pursuant to 15 U.S.C. § 1692a(6) because its principal business purpose is the purchase of defaulted debts for collection. *See also McAdory v. M.N.S. & Assocs., LLC,* 952 F.3d 1089 (9th Cir. 2020).

7. RRA CP is also a debt collector pursuant to 15 U.S.C. §1692a(6) because its principal business activity involves the use instrumentalities of interstate commerce or the mails related to the enforcement of security interests as described in 15 U.S.C. § 1692f(6) which bars certain debt collectors, like RRA CP, from threatening to take any nonjudicial action to effect dispossession of property when there is no present right to possession of the property claimed as collateral when the debt collection action is barred as a matter of law.

8. RRA CP meets the definition of an out of state collection agency, as defined by RCW 19.16.100(12), but they are not licensed under the Act.

9. RRA CP purports to be the owner of the home equity line of credit loan ("HELOC") secured by the Marquez property located at 4611 S. 164th St., Tukwila, WA 98188. RRA CP's purported purchase of the HELOC occurred after April 14, 2016, when it was already in default.

10. RRA CP retained Real Time Resolutions, Inc. ("Real Time") to service and foreclose the HELOC with the express authority granted of RRA CP.

11. Defendant Real Time is a Texas corporation headquartered in Dallas, Texas and conducts mortgage servicing and consumer debt collection operations in multiple states.

12. Real Time regularly attempts to collect loans owned by others, including RRA CP, which are in default at the time Real Time assumes servicing.

13. Real Time uses the mails and telephone system in conducting business.

14. Real Time is a licensed debt collector under RCW 19.16.100(10) and (12).

15. Real Time was, at all times relevant to the allegations in this complaint, acting as the agent of Defendant RRA CP and as the servicer of the mortgage loan at issue in this matter, within the meaning of the Regulation Z of the Truth in Lending Act ("TILA), and subject to its requirements at 12 CFR 1026.40.

16. At all times relevant hereto and in all matters alleged herein, Real Time acted as agent for and on behalf of Defendant RRA CP. All the actions taken by Real Time as alleged in this matter were taken under the supervision and/or direction of RRA CP.

17. North Star Trustee, LLC ("North Star") is a nonjudicial foreclosure trustee. North Star is a debt collector pursuant to 15 U.S.C. §1692a(6) because nonjudicial foreclosure is a means of collecting a debt, whether directly or indirectly. Additionally, for the purposes of 15 U.S.C. §1692f(6), under Title 15, a debt collector includes any person… in any business the principal purpose of which is the enforcement of security interests.

18. Defendants have used the mails, wires, and the internet to reach across state lines into Washington to conduct their business. Real Time and North Star provide services and receive compensation for performance of these services but do not have a direct stake in the ownership of or a security interest in the collateral used to secure the mortgage loans they service or foreclose. By having no skin in the game whatsoever, these defendants have not

been willing to take the time to investigate or to otherwise address any concern that borrowers like Mr. Marquez have about the collectability of the HELOC or the foreclosure of their Residence.

## II. FACTS

19. This case rises from the emergence of the defaulted debt-buying industry in the wake of the 2008 financial collapse. The debt-buying industry finds fuel from private equity hedge funds to acquire hundreds of thousands of defaulted, non-performing, charged-off consumer mortgage loans for a minuscule amount of their face-value. These entities partner with companies like Real Time and North Star to varnish the debt with monthly statements and declarations to plug the holes in the paper. This case brilliantly highlights the inherently unfair and deceptive practices attendant to the foreclosure of a non-negotiable Home Equity Line of Credit Mr. Marquez stopped paying approximately five years before RRA CP came into existence and ten years before RRA CP appeared to assert its "rights."

20. Mr. Marquez purchased his homestead in December of 2005 with two mortgages originated through Countrywide Home Loans, Inc. in what is known as an 80/20 mortgage. Mr. Marquez executed a Home Equity Credit Line Agreement and Disclosure Statement on December 12, 2005, which was subordinate to the first mortgage.

21. The open-ended HELOC did not extend Mr. Marquez a loan for a fixed amount of money for a term certain. According to Paragraph 5 of the HELOC:

> **CREDIT LIMIT.** My Credit Limit under this Agreement is $59,900.00. I promise not to request a loan which will cause the unpaid principal balance of my Account to exceed my Credit Limit. You can increase the Credit Limit at any time without prior notice to me. You can refuse to make loans that cause my obligations under this Agreement to exceed my Credit Limit. You will make loans on my Account based on the 'Available Credit Limit' shown on my most recent periodic statement…

22. The HELOC did not contain a fixed term or date of maturity. According to Paragraph 1 of the HELOC:

> Unless you have sent me written notice not later than the sixtieth (60th) day before the Initial Draw Period ends that you have decided

> not to renew such Initial Draw Period such, Initial Draw Period will
> automatically renew for one additional sixty (60) month period, and
> the Draw Period on my Account shall thereafter be considered to be
> 120 months for purposes of this Agreement.

23. The HELOC did not contain a fixed interest rate. According to Paragraph 6. Of the HELOC, the initial annual percentage rate was 10.500% and the maximum annual percentage rate was "18.000% or the maximum rate permitted by law, whichever is less."

24. The HELOC makes frequent references to the issuance of checks and a credit card for the Account.

25. The HELOC does not contain the word "NOTE."

26. The HELOC uses the word "accelerate" once, on page seven, but otherwise lacks any explicit reference to acceleration.

27. To secure the HELOC, Mr. Marquez executed a "Deed of Trust (Line of Credit Trust Deed)" (hereinafter "Line of Credit Trust Deed") that was recorded on December 15, 2005, as King County, Washington Instrument 20051215002817.

28. The Line of Credit Trust Deed named Landsafe Title of Washington as the Trustee.

29. The Line of Credit Trust Deed named the Beneficiary as "Mortgage Electronic Registration Systems, Inc. as designated nominee for Countrywide Home Loans, Inc."

30. The Line of Credit Trust Deed contained a MERS Mortgage Identification Number ("MIN") indicating that the Marquez HELOC mortgage was "recorded in the name of the Mortgage Electronic Registration System, Inc. or MERS®, as nominee for the owner of the mortgage loan, and subsequent assignments of the mortgage were, or in the future may be, at the discretion of the master servicer, registered electronically through the MERS® System."

31. The Line of Credit Trust Deed cross-references "The Note."

32. The Line of Credit Trust Deed omits any references to the term "acceleration."

33. The Line of Credit Trust states: "The maximum term of the Note is 25 years, including any renewals or extensions thereof."

34. The Line of Credit Trust Deed states:

> This Deed of Trust will secure your loan to us in the principal amount of $59,500 or so much thereof as may be advanced and readvanced from time to time to GABRIEL MARQUEZ VARGAS the Borrower(s) under the Home Equity Line Agreement and Disclosure Statement (the "Note") dated DECEMBER 07, 2005, plus interest and costs, late charges and all other charges related to the loan, all of which are sums repayable according to the Note. This Deed of Trust will also secure the performance of all of the promises and agreements in this Deed of Trust, any extensions, renewals, amendments, supplements and other modifications of the Note, and any amounts advanced by you under the terms of the Section of the Deed of Trust entitled "Our Authority to You." Loans under the Note may be made, repaid and remade from time to time in accordance with the terms of the Note and subject to the Credit Limit set forth in the Note.

35. Upon information and belief, Countrywide Home Loans, Inc. originated the Marquez HELOC and sold it to the HELOC CWHEQ Revolving Home Equity Loan Trust, Series 2005-I which packaged the HELOC into a $2,000,000,000 security that was sold to individual and institutional investors. According to the CWHEQ Revolving Home Equity Loan Trust, Series 2005-I Prospectus Supplement dated December 22, 2005, the notes sold to investors "will be secured by a trust fund consisting primarily of two loan groups of home equity revolving credit line loans made or to be made in the future under certain home equity revolving credit line loan agreements. The loans will be secured by second deeds of trust or mortgages primarily on one- to four-family residential properties and will bear interest at rates that adjust based on the prime rate. The trust fund may initially include funds that are expected to be used to acquire additional home equity revolving credit line loans not included in the initial cut-off date pool."

36. The Prospectus Supplement assured investors that the mortgage servicer would mail borrowers like Mr. Marquez monthly billing statements. According to the Prospectus Supplement: "Billing statements are mailed monthly by the master servicer (emphasis added). The statements detail all debits and credits and specify the minimum payment due and the *available credit line*. *Notice of changes in the applicable loan rate are provided by the master servicer to the borrower with the monthly statements*" (emphasis added).

37. The Prospectus Supplement assured investors that the mortgage servicer would timely foreclose the properties securing the defaulted HELOCs. According to the Prospectus Supplement: "The general policy of the master servicer is to initiate foreclosure in the underlying property for a mortgage loan after the loan is 90 days or more delinquent and satisfactory arrangements cannot be made with the borrower, or if a notice of default on a senior lien is received by the master servicer."

38. The Prospectus Supplement stated that "[t]he sale and servicing agreement will require that Countrywide deliver to the depositor for delivery to the trust fund, and the trust fund will deliver to the custodian, the mortgage notes related to the mortgage loans endorsed in blank and the Related Documents…"

39. However, according to the Prospectus Supplement, "[i]n lieu of delivery of original documentation, Countrywide may deliver documents that have been imaged optically on delivery of an opinion of counsel that the imaged documents are enforceable to the same extent as the originals and do not impair the enforceability of the transfer to the trust fund of the mortgage loans."

40. Moreover, "[i]n addition, with respect to any of the mortgage loans, in lieu of transferring the related mortgage to the indenture trustee as one of the Related Documents, the depositor may at its discretion provide evidence that the related mortgage is held through the MERS® System."

41. The Purchase and Sale Agreement for the CWHEQ Revolving Home Equity Loan Trust, Series 2005-A makes clear that MERS registered loans did not require the delivery to the trust of "an original assignment of mortgage in blank in recordable form."

42. The Purchase and Sale Agreement for CWHEQ Revolving Home Equity Loan Trust, Series 2005-A represented and warrantied that the HELOC "Mortgage Notes constitute either 'instruments' or 'general intangibles' as defined in the UCC."

43. At some point between 2005 and 2010, Bank of America Home Loans began servicing the Marquez HELOC. Upon information and belief, Mr. Marquez made a $331.55 payment on or about December 22, 2010, that Bank of America applied to the August 2010 installment. Mr. Marquez made his final payment in the amount of $342.60

COMPLAINT - 7

on or about February 18, 2011, that Bank of America applied to the September 2010 installment. On or about February 18, 2011, a principal amount of $59,761.05 remained owing on the HELOC. Mr. Marquez did not make any payments after. More than ten years elapsed between the date of last payment and the Notice of Default.

44. Upon information and belief, Countywide Home Loans, Inc., Bank of America, or some other entity "charged-off" the Marquez HELOC between February 18, 2011 and November 6, 2012 because the account history omits any activity on the Account between those dates.

45. On or about June 27, 2012, Mortgage Electronic Registration Systems, Inc. ("MERS"), acting through Assistant Secretary Rene Rosales, executed a purported "Assignment of Deed of Trust" ("2012 AODT"), recorded on July 2, 2012, as King County Instrument 20120702000394. The 2012 AODT claims that MERS, "For Value Received"… "does hereby grant, sell, assign, transfer and convey unto THE BANK OF NEW YORK MELLON FKA THE BANK OF NEW YORK ("BONY"), AS SUCCESSOR TRUSTEE TO JP MORGAN CHASE BANK, N.A. ("Chase"), AS TRUSTEE ON BEHALF OF THE CERTIFICATEHOLDERS OF THE CWHEQ INC., CWHEQ REVOLVING HOME EQUITY LOAN TRUST, SERIES 2005-I ("BONY")…all beneficial interest under that certain Deed of Trust, described below together with the note(s) and obligations therein described and the money due and to become due thereon with interest and all rights accrued or to accrue under said Deed of Trust."

46. The 2012 Assignment identified BONY as a successor trustee to Chase who acted as trustee on behalf of the certificateholders of the CWHEQ INC., CWHEQ REVOLVING HOME EQUITY LOAN TRUST, SERIES 2005-I.

47. On or about November 6, 2012, Real Time Resolutions, Inc. posted the Marquez HELOC to its systems as a "new loan" showing a due date of September 25, 2010, and a principal balance of $59,761.05.

48. The next entry in the Real Time "Loan History Summary" was made on January 5, 2013.

49. The Loan History Summary does not track accumulated, unpaid interest.

50. Real Time sent some monthly statements to Mr. Marquez.

51. The monthly statements sent by Real Time do not detail the available credit line.

52. The monthly statements sent by Real Time contain interest rate information but do not appear to detail *changes* in the interest rate.

53. The Real Time Loan History Summary indicates that a new investor purchased the Marquez HELOC Account on July 1, 2016, and the account was due for the September 25, 2010 payment.

54. The Real Time Loan History Summary indicates that a new investor purchased the Marquez HELOC Account on July 5, 2016, and the account was due for the September 25, 2010 payment.

55. On or about May 23, 2017, "The Bank of New York Mellon fka The Bank of New York, Successor Indenture Trustee to JP Morgan Chase Bank, N.A., as Trustee for the CWHEQ Revolving Home Equity Loan Trust, Series 2005-I (assignor)" acting through Bank of America Assistant Vice President Dana M. Burton executed a purported "Assignment of Deed of Trust" ("2017 AODT"), recorded on June 1, 2017, as King County Instrument 20170601000370. The 2017 AODT claims that BONY "FOR GOOD AND VALUABLE CONSIDERATION, the sufficiency of which is hereby acknowledged…does convey, grant, assign, transfer and set over the described Deed of Trust with all interest secured thereby, all liens, and any rights due or to become due thereof to RRA CP OPPORTUNITY TRUST 1.

56. The 2017 AODT referred to Chase as "Successor Indenture Trustee," while the 2012 AODT simply referred to Chase as "Successor Trustee." Moreover, the 2017 AODT referred to the CWHEQ Revolving Home Equity Loan Trust, Series 2005-I while the 2012 AODT referred to a different entity or entities, CWHEQ INC., CWHEQ REVOLVING HOME EQUITY LOAN TRUST, SERIES 2005-I.

57. A statement from Real Time dated **January 31, 2021**, stated "Your account became delinquent on *09/26/2010*" (emphasis added). This statement indicated an interest rate of 6.75% and an outstanding principal balance of $59,761.05.

58. On or about October 4, 2021, Mr. Marquez received a Notice of Pre-foreclosure Options from ZBA Law, LLP. Mr. Marquez subsequently submitted financial information and

attended an ultimately futile meeting with Real Time. Mr. Marquez spent thousands of dollars to investigate his options. From October 4, 2021 until the present, the defendants actions have also caused Mr. Marquez to suffer unnecessary fear, frustration, and anxiety regarding the loss of his homestead.

59. A statement from Real Time dated **October 31, 2021**, stated "Your account became delinquent on *01/26/2016*" (emphasis added). This statement indicated an interest rate of 6.75% and an outstanding principal balance of $59,429.04.

60. Correspondence dated by Real Time on November 15, 2021 provided Mr. Marquez "[a] copy of the signed Home Equity Credit Line Agreement and Disclosure Statement, bearing your signature and detailing your promise to *pay a specific sum under explicit terms*…" (emphasis added). The correspondence included multiple documents, including the Loan History Summary, Deed of Trust, and a copy of the HELOC which contains an undated allonge, endorsed in blank without recourse, executed by Countrywide Home Loans, Inc.

61. An Real Time Payoff Request dated December 21, 2021 stated:

> Loan Type HELOC
> Interest rate 7%
> Due: 1/25/2016
> Investor 454
> Principal balance $59,429.04
> Interest Method Daily/Actual

62. A statement from Real Time dated **January 31, 2022**, stated "Your account became delinquent on *01/26/2016*" (emphasis added). This statement indicated an interest rate of 6.75% and an outstanding principal balance of $59,429.04.

63. On or about April 5, 2022, David Rosas, Real Time's Director of Loss Mitigation, executed a document entitled "Declaration of Note Holder." Paragraph 3 of The Declaration stated, in relevant part: "RRA CP Opportunity Trust 1 By: Real Time Resolutions, Inc.; Its: Attorney-in-Fact is the *holder* of the *Promissory Note* dated 12/7/2005 executed by Gabriel Marquez Vargas, an unmarried man (the borrower") in favor of *Countrywide Home Loans, Inc.* in the *principal amount* of $59,900.00" (emphases added).

Paragraph 4 of the Declaration stated, in relevant part, "The Beneficiary has *possession* of the original **note**" (emphasis added).

64. North Star Trustee, LLC prepared and served a Notice of Default on Mr. Marquez on or around May 9, 2022. The Notice of Default alleged:

> The Beneficiary and Note holder: RRA CP Opportunity Trust 1
> Monthly payments due May 25, 2016 through April 28, 2022
>
> **PROMISSORY NOTE INFORMATION**
> Note Dated: 12/7/2005
> Note Amount: $59,900.00
> Interest Paid To: April 25, 2016
> Next Due Date: May 25, 2016

65. A statement from Real Time dated **July 31, 2022**, stated "Your account became delinquent on *05/26/2016*" (emphasis added). This statement indicated an interest rate of 8.25% and an outstanding principal balance of $58,101.00.

66. North Star Trustee, LLC prepared, served, and recorded a Notice of Trustee's Sale on or about July 15, 2022 as King County Instrument 20220715000341. The Notice of Trustee's Sale alleged:

> Current beneficiary of the deed of trust: RRA CP Opportunity Trust 1
> Monthly payments due May 25, 2016 through July 1, 2022
>
> **PROMISSORY NOTE INFORMATION**
> Note Dated: 12/7/2005
> Note Amount: $59,900.00
> Interest Paid To: April 25, 2016
> Next Due Date: May 25, 2016

67. The Notice of Foreclosure accompanying the Notice of Trustee's Sale indicated a principal balance due of $58,101.00, $28,251.78 in unpaid interest, and $7,826.82 in fees and costs.

### III. CAUSES OF ACTION

1. **Quiet Title Action Against RRA CP**

68. Plaintiff incorporates herein by reference as though fully set forth at length, each preceding allegation and statement contained herein, inclusive, of the Factual Allegations.

69. Under Washington law, promissory notes and deeds of trust securing such notes are subject to a six-year statute of limitations. RCW 416.040(1); *Westar Funding v. Sorrels*, 157 Wn.App. 777, 784 (2010). When an action to foreclose on a deed of trust is barred by the statute of limitations, RCW 7.28.300 authorizes the record owner to bring a quiet title action to clear the deed of trust. *Westar*, 157 Wn.App at 785.

70. The Marquez HELOC is an open-ended credit agreement whose monetary obligation and date of maturity were never fixed in either the HELOC Agreement or the Line of Credit Trust Deed. This is instrument is not governed by Article 3 provisions of the Uniform Commercial Code "UCC" because this is not a negotiable instrument.

71. In the context of Article 3, "[a]n instrument is a 'note' if it is a promise and is a 'draft' if it is an order." RCW 62A.3-104(3)€. "'Instrument' means a 'negotiable instrument.'" RCW 62A.3-104(3)(b). For the purposes of Article 3, the Marquez HELOC is neither a note nor an instrument because it is not negotiable.

72. Under Washington law, a "'negotiable instrument' means an unconditional promise or order to pay a fixed amount of money, with or without interest or other charges…and is payable on demand or a definite time…" RCW 62A.3-104(a).

73. Here, the words "Note," a promise to pay a sum certain, and "maturity" date cannot be found in the HELOC. Absent the ability to unequivocally ascertain the amount of the sum certain owed on the HELOC and the date of maturity, the HELOC cannot constitute a negotiable instrument. *See, e.g., Investment Consultants, Inc. v. Ramirez (In re Ramirez)*, No. CC-19-1257-STaF, 2020 WL 4436263, at *8 n.6 (B.A.P. 9th Cir. Aug. 3, 2020) (unpublished) (A HELOC is not a promissory note within the meaning of Article 3 of the Uniform Commercial Code).

74. Thus, the "beneficiary" who holds the negotiable instrument controls acceleration prior to maturity does not apply to a HELOC. *Lemery v. Wells Fargo Bank*, No. C17-1525 RSM, 2018 U.S. Dist. LEXIS 129153 at 5 (W.D. Wash. Aug. 1, 2018) ("Acceleration is the len'er's prerogative). Thus, acceleration concepts do not control the accrual of the statute of limitations for the Marquez HELOC.

75.     In this HELOC the provisions of the non-negotiable agreement in Paragraph 18(I)– Other Provisions, Waiver of Notice – states that any right to notice of default demand or other notices and formalities are not required.

76.     Here, the account history for the HELOC shows a gap in the payment history from February 18, 2011 through November 6, 2012. This gap indicates no statements were produced and Bank of America, Countrywide, or another entity charged-off the loan. Thus, all subsequent parties took possession of the HELOC knowing that the agreement was in default..

77.     The Defendants know they are running out of time.  Real Time's January 31, 2021 statement lists September 26, 2010 as the date of delinquency. Without explanation, Real Time's October 31, 2021 statement alleged, "Your account became delinquent on *01/26/2016*" (emphasis added). Real Time's July 31, 2022 statement provided yet a different date of delinquency of May 26, 2016.

78.     For unknown reasons, RTR seems to be treating this non-negotiable HELOC like an Article 3 installment note. Its attempt to eliminate time-barred installment payments before seeking a  nonjudicial foreclosure process is meaningless. No payments at this time are collectable as the HELOC is completely barred by the general six-year statute of limitations for contracts enumerated at RCW 4.16.040.

79.     RRA CP also lacks standing to bring a non-judicial foreclosure. It has not presented any credible evidence to show that the requirements of UCC Article 9 have been satisfied, such that it is entitled to enforce the HELOC.

80.     It seems that RRA CP believe that "holding" the HELOC Agreement alone is enough to enforce it. However, this is not a negotiable instrument, and to foreclose they must authenticate the chain of assignments in accordance with Article 9. In order to assign an enforceable interest in the HELOC, the alleged sale (1) from Countrywide Home Loans, Inc. to Mortgage Electronic Registration Systems, Inc., (2) from MERS to the CWHEQ Revolving Home Equity Loan Trust, Series 2005-I; (3) from CWHEQ Revolving Home Equity Loan Trust, Series 2005-I to The Bank of New York Mellon fka The Bank of New York, Successor Indenture Trustee to JP Morgan Chase Bank, N.A., as Trustee for the CWHEQ Revolving

Home Equity Loan Trust, Series 2005-I; and (4) from BONY to the RRA CP OPPORTUNITY TRUST 1 would have to satisfy the following elements:

> (1) Value has been given;
> (2) The [seller][1] has rights in the collateral or the power to transfer rights in the collateral…and
> (3) One of the following conditions is met:
>    (A) The [seller] has authenticated a security agreement that provides a description of the collateral… or
>    (B) The collateral is not a certificated security and is in the possession of the secured party under RCW 62A.9A-313 pursuant to the [seller's] security agreement; or
>    (C) The collateral is a certificated security in registered form and the security certificate has been delivered to the secured party under RCW 62A.8-301 pursuant to the [seller's] security agreement; or
>    (D) The collateral is deposit accounts, electronic chattel paper, investment property, letter-of-credit rights, or electronic documents, and the secured party has control under RCW 62A.7-106, 62A.9A-104, 62A.9A-105, 62A.9A-106, or 62A.9A-107 pursuant to the [seller]'s security agreement.

RCW 62A.9A-203

81. The facts demonstrate that Real Time, North Star, and RRA CP RRA CP falls short in authenticating the documents comprising the chain of title because the securitized trust documents expressly articulate that the original assignments were scanned and shredded.

82. Moreover, perhaps more fundamentally, while the recorded assignments speak of value, they do not actually articulate what value was given because debt buyers loathe the disclosure of such information in the public domain. Yet Article 9 enforcement requires the disclosure of the actual value paid at every assignment. RCW 62A.9A-203.

83. The Defendants also cannot prove up their authority in reliance on a beneficiary declaration which speaks of a sum certain relevant only to a negotiable instrument, language completely foreign to the enforcement of a non-negotiable HELOC Agreement.

84. As such, the statute of limitations bars any actions to foreclose the HELOC and RCW 7.28.030 empowers this Court to quiet title in favor of Mr. Marquez and against RRA

---

[1] Article 9 uses the word "debtor" to include the "seller of accounts, chattel paper, payment intangibles, or promissory notes." RCW 62A.9A-102(a)(28)(B). We have changed the term to "seller" for clarity.

COMPLAINT - 14

CP. The HELOC constitutes a cloud on Mr. Marquez's title that this honorable court should remove.

## 2. Attempts to Collect a Time Barred Debt Violate Fair Debt Collection Practices Act

85.     Plaintiff re-alleges and incorporate all previous paragraphs herein.

86.     Real Time collects the Plaintiff's loan on behalf of defendant RRA CP. It did not service the Loan until after Mr. Marquez defaulted.

87.     Thus, Defendant Real Rime was acting as a debt collector, as that term is defined in the FDCPA, as to the delinquent consumer debt they sought to collect from Mr. Marquez.

88.     The available evidence leads to the reasonable inference that Bank of America, N.A., Countrywide Home Loans, Inc., or some other entity charged-off the HELOC before Real Time appeared in late 2012 and well before RRA CP came into existence. A predecessor's charge-off and waiver of the right to collect interest bars subsequent successors from charging interest and fees. The loan history gap shows that Bank of America, Countrywide, or another entity waived fees and interest after the HELOC defaulted, and Real Time violated the FDCPA by collecting fees and interest knowingly waived by the original creditor seller.

89.     Federal rules also bar creditors from charging any additional fees or interest on a HELOC after deeming an account uncollectible, charging it off, and ceasing the delivery of periodic statements to the borrower. See 12 CFR § 1026.5(b)(2)(i) and 1026.7. The gap in the account history and subsequent sale of the defaulted debt gives rise to an inference that Bank of America or Countrywide Home Loans, Inc. charged-off the Marquez HELOC, stopped sending statements to Marquez, and waived the right to charge him additional fees or interest on the charged-off account.

90.     The evidence from the record indicates the defendants acted in concert to collect on a time barred debt. They acted to eliminate 64 and then 68 installment payments when there are no installments owed on this HELOC.

91.     Given the information contained in the record identifying three different dates of default and corresponding differences in the interest fees, and principal balance owed, the defendants have provided abundant evidence that they continue to collect on time-barred debt.

92. Real Time cannot foreclose the Marquez HELOC because it lacks the present right to possession of the Marquez collateral when they initiated nonjudicial foreclosure against Mr. Marquez.

93. Any legal right to collect on the Marquez HELOC expired on or about November 7, 2018 because the six-year statute of limitations accrued for the entire HELOC on February 18, 2011, that date of last payment on the loan. Thus, Real Time violated the FDCPA at 15 U.S.C. §1692f(6) because the law bars debt collectors from threatening to take any nonjudicial action to effect dispossession of property when there is no present right to possession of the property claimed as collateral when the debt collection action is barred as a matter of law. Notably, the HELOC Agreement indicates that the creditor agrees to comply with Regulation Z.

94. Defendant Real Time started collecting on this debt after it was already in default. They are a "debt collector" as defined by the FDCPA, 15 U.S.C. § 1692a(6), because they regularly use the mails and/or the telephone in their business, the principal purpose of which is to collect, or attempt to collect, directly or indirectly, delinquent consumer debts.

95. Collecting on a time-barred debt is a practice uniformly held by courts to violate the FDCPA as a matter of law.

96. Here, Real Time has continued active debt collection through at least January 31, 2021. Real Time sent Mr. Marquez one or more monthly statements debt from March 2017 through January 2021, seeking to collect time barred.. Thus, Defendant Real Time violated the FDCPA when they sent misleading mortgage statements.

97. Since the mortgage debt was time barred, any communication to Mr. Marquez that included amounts that were not owed, were an attempt to trick the Plaintiff into resuming payments that were not owed to restart the statute of limitations.

98. Here, Defendant Real Time communications that Mr. Marquez still owed the time barred debt violated the FDCPA, including but not limited to the following:

    a. Using any false, deceptive, or misleading representation or means in connection with the collection of any debt, in violation of 15U.S.C. §§ 1692e and e(10);

b. Falsely representing the character, amount, or legal status of any debt, in violation of 15 U.S.C. § 1692e(2)(A);

c. Representing or implying that nonpayment of any debt will result in …. the seizure ……or sale of any property or wages of any person when such action is not lawful, in violation of 15 U.S.C. § 1692d(4);

d. Using unfair or unconscionable means to collect or attempt to collect any debt, in violation of 15 U.S.C. § 1692f;

e. Collecting any amount (including any interest, fee, charge, or expense incidental to the principal obligation) unless such amount is expressly authorized by the agreement creating the debt or permitted by law, in violation 15 U.S.C. § 1692f(1); and

99. Such conduct has damaged Mr. Marquez by causing him to incur sums to hire an attorney to investigate such unlawful actions, and but for their conduct, he would not have suffered fear, frustration, and anxiety regarding the loss of his homestead through unlawful and deceptive foreclosure proceedings based on time-barred debts.

100. The Plaintiff's emotional turmoil is exacerbated because he defaulted on his first mortgage during the COVID crisis and the decision of Real Time to collect a time-barred debt is interfering with the Plaintiff's ability to negotiate a modification and resolution of the default on the first mortgage loan.

101. Defendant Real Time's conduct in violation of the FDCPA caused and proximately caused injury and damages to the Plaintiff.

102. Mr. Marquez is entitled to compensatory, special and general damages as allowed by law.

103. Mr. Marquez is also entitled to statutory damages, attorneys' fees and costs pursuant to 15 U.S.C. § 1692k.

### 3. Unlawful Collection Attempts on Time Barred Debts in Violation of RCW 4.16.040(1) Violate the Washington State Consumer Protection Act.

104. The Plaintiff re-alleges and incorporate all previous paragraphs herein.

105. By knowingly attempting to collect upon time barred debts under the color of law, Real Time engaged in unfair and deceptive business practices in violation of the Revised Code of Washington Ch. 19.86. It is unlawful for North Star and Real Time to "[b]ring an action or initiate an arbitration proceeding on a claim when the licensee knows, or reasonably should know, that such suit or arbitration is barred by the applicable statute of limitations." RCW 19.16.250(23).

106. The violations of the Fair Debt Collection Practices Act by Real Rime as described herein constitute *per se* violations of the Washington Consumer Protection Act ("CPA").

107. By wrongly conflating Article 3 enforcement concepts with the rules for the enforcement of a non-negotiable HELOC Agreement, Real Time unfairly deceived Mr. Marquez, the public, and the courts into believing that HELOC Agreements may be enforced as negotiable instruments.

108. By failing to articulate a consistent position regarding the accrual of the statute of limitations with respect to individual installment payments, Real Time published inaccurate statements and default information that unfairly deceived Mr. Marquez and the public record.

109. Real Time's production and conveyance of post-charge off monthly statements without qualification and which included fees and interest not allowed by law unfairly deceived recipients such as Mr. Marquez about the amount of any debt they owed.

110. Real Time's production of inaccurate monthly statements that omitted information regarding changes in the interest rate and available credit line unfairly deceived recipients regarding the nature of the debt.

111. Real Time's production of statements which contained inflated, time-barred principal amounts unfairly deceived the Plaintiff. Similarly, on November 15, 2021, Real Time deceptively alleged that Mr. Marquez agreed to "pay a specific sum under explicit terms…"

112. The decision of Real Time to include interest and fees on a charged-off HELOC on documents recorded in the public record unfairly deceived the public and recipients such as Mr. Marquez about the character and amount of any debt they owed.

113. The preparation, publication, and propagation of documents like the "Declaration of Note Holder" which contained references to legal nullities unfairly deceived recipients like Mr. Marquez because the documents wrongfully inculcated the belief that Real Time possessed the legal authority and right to seize Washington homesteads.

114. Such practices are likely to be repeated further, as illustrated by, among other things, similar conduct toward hundreds of other alleged debtors in Washington.

115. The actions of Real Time injured Mr. Marquez because he spent money to defend and investigate the actions of the defendants as a proximate cause of their willful failure to comply with state and federal law.

116. Real Time further injured Mr. Marquez by engaging in unfair and deceptive conduct which directly caused Mr. Marquez to suffer fear, frustration, and anxiety in the face of the wrongful loss of his homestead because the statute of limitations barred the defendants from foreclosing.

117. RRA CP is vicariously liable for the acts and omissions of Real Time because it engaged and authorized Real Time to act on its behalf through written contracts in relation to the Plaintiff and/or ratified Real Time's conduct performed on their behalf.

118. The wrongful foreclosure of Washington homesteads based on partially or completely time-barred debts portends an unacceptable risk of propagation and actually damages the public's faith in the rule of law, the public's sense of security in their homesteads, and unnecessarily burdens the recorder, assessor, courts, Sheriffs and other public officials who provide essential services to enable creditors, loan servicers, and their nonjudicial foreclosure trustees to effectuate foreclosures under the color of law.

119. The wrongful conduct exhibited by the defendants should be enjoined as authorized by RCW 19.86.

120. In addition to their individual damages, Plaintiffs are entitled to an award of reasonable attorney's fees and non-taxable and taxable costs incurred on his behalf.

**4. <u>Declaratory and Injunctive Relief Against Real Time .</u>**

121. The Plaintiff re-alleges and incorporates all previous paragraphs herein

122. A plaintiff may seek a declaratory judgment under RCW 7.24 *et seq.* and injunctive relief for violations of the Consumer Protection Act. RCW 7.24 *et seq.*; RCW 19.86.090.

123. Mr. Marquez seeks injunctive relief from this Court to enjoin Real Time from collecting debts in the manner described above from the Plaintiff and any other person similarly situated. *Hockley v. Hargitt*, 82 Wn.2d 337, 350, 510 P.2d 1123 (1973).

124. Specifically, Mr. Marquez seeks an injunction prohibiting Real Time from pursuing their unlawful collection tactics, including but not limited to demanding collection fees/costs that are specifically disallowed by statute, misrepresenting the status of the debt, and collecting on foreclosure debt barred by the passing of the statute of limitations.

125. Plaintiff has reason to believe these actions make up a pattern and practice of behavior capable of, or which, impacts similarly situated consumers.

126. Injunctive relief is necessary to prevent further injury to Mr. Marquez and the Washington state public.

127. Injunctive relief should therefore issue as described herein.

Respectfully submitted this 10th day of October 2022.

*Attorneys for Plaintiffs*:

BARRAZA LAW, PLLC

 /s/ V. Omar Barraza
V. Omar Barraza, WSBA #43589
10728 16th Ave SW
Seattle, WA 98146
Phone (206) 933-7861
Fax (206) 933-7863
E-mail: *omar@barrazalaw.com*