1
2
3
4
5
6
7
8
9
10
11
12
13
14
15

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

GABRIEL MARQUEZ VARGAS,

               Plaintiff,

    v.

RRA CP OPPORTUNITY TRUST 1, et al.,

               Defendants.

CASE NO. 2:22-CV-01440-LK

ORDER GRANTING IN PART, DEFERRING IN PART, AND DENYING IN PART MOTION TO DISMISS, GRANTING IN PART AND DENYING IN PART MOTION TO CERTIFY, AND DENYING TRO

16
17
18
19
20

       This matter comes before the Court on Defendants RRA CP Opportunity Trust 1 and Real Time Resolutions' Motion to Dismiss. Dkt. No. 27.[1] Also pending before the Court are Plaintiff Gabriel Marquez Vargas' Motion Seeking Temporary Restraining Order and Permanent Injunction Re the Nonjudicial Foreclosure Sale of Residence, Dkt. No. 43, and Motion to Certify Questions to the Washington Supreme Court, Dkt. No. 50.

21
22
23

       Marquez Vargas asserts a variety of consumer protection claims against Defendants for their attempts to collect an allegedly time-barred debt on a home equity line of credit. He also

24

---

[1] Defendant North Star Trustee, LLC joins the motion to dismiss. *See* Dkt. No. 28.

ORDER GRANTING IN PART, DEFERRING IN PART, AND DENYING IN PART MOTION TO DISMISS, GRANTING IN PART AND DENYING IN PART MOTION TO CERTIFY, AND DENYING TRO - 1

seeks to quiet title to his property, which was secured by a deed of trust as collateral for the home equity loan. Much of this case boils down to two issues: (1) whether the home equity agreement is a demand or installment note; and (2) whether a possessor of a home equity line of credit qualifies as a "beneficiary" under Washington's Deeds of Trust Act (the "DTA"). As to the first issue, the Court concludes that the home equity agreement is an installment note. This means that RRA may recover delinquent payments that were less than six years old when the nonjudicial foreclosure proceedings commenced. The second issue—whether RRA, as a possessor of a home equity line of credit, qualifies as a "beneficiary" under the DTA—presents questions of local law that have not been clearly determined. Accordingly, the Court intends to certify these questions to the Washington State Supreme Court, and seeks supplemental briefing from the parties regarding the framing of the questions.

Marquez Vargas' motion to certify is thus granted in part. Defendants' motion to dismiss is granted in part, denied in part, and deferred in part. Given the parties' agreement to enjoin the trustee's sale during the pendency of this action, the Court denies as moot Marquez Vargas' motion for a temporary restraining order.

## I.    BACKGROUND

The Court first provides an overview of the DTA and the procedure for halting trustee sales. It then summarizes the relevant factual background.

### A.    Washington's Deeds of Trust Act

For many years Washington law recognized mortgages as the sole security interest in real property. *Brown v. Wash. State Dep't of Com.*, 359 P.3d 771, 773 (Wash. 2015). Mortgages must be foreclosed through the judicial process. *Id.* In 1965, however, the Washington legislature enacted the DTA to "supplement the time-consuming judicial foreclosure procedure for mortgages by providing an alternative private sale which results in substantial savings of time"—i.e., the

nonjudicial foreclosure sale. *Id.* (cleaned up). A statutory deed of trust now operates as an "equitable mortgage," *Blair v. Nw. Tr. Servs., Inc.*, 372 P.3d 127, 133 (Wash. Ct. App. 2016), and creates a security interest in real property, *Brown*, 359 P.3d at 773. It is a three-party transaction in which land is conveyed by the borrower (the "grantor") to a trustee, who holds the title in trust for the lender (the "beneficiary") as security for the credit or loan that the lender has given the borrower. *Klem v. Wash. Mut. Bank*, 295 P.3d 1179, 1185 (Wash. 2013). The deed of trust thus protects the lender-beneficiary by giving it "power to nominate a trustee and giving that trustee the power to sell the home if the homeowner's debt is not paid." *Bain v. Metro. Mortg. Grp., Inc.*, 285 P.3d 34, 36 (Wash. 2012); *see* Wash. Rev. Code § 61.24.020.

In a nonjudicial foreclosure action, the trustee assumes the role of the judge as an impartial third party "who owes a duty to both parties to ensure that the rights of both the beneficiary and the debtor are protected." *Klem*, 295 P.3d at 1188. In recognition of this "tremendous power" vested in the trustee, *id.*, the DTA establishes detailed procedures that must be satisfied before a trustee's sale may occur, *see Brown*, 359 P.3d at 774–76 (walking through statutory procedure); *Cox v. Helenius*, 693 P.2d 683, 686 (Wash. 1985) ("The act contains several safeguards to ensure that the nonjudicial foreclosure process is fair and free from surprise."). And, as relevant here, the statute permits a borrower to apply for an injunction to restrain a trustee's sale "on any proper legal or equitable ground[.]" Wash. Rev. Code § 61.24.130(1). This is the "only means" for a borrower to preclude sale "once foreclosure has begun with receipt of the notice of sale and foreclosure." *Cox*, 693 P.2d at 686; *see also Plein v. Lackey*, 67 P.3d 1061, 1066 (Wash. 2003) (this procedure provides a means of "stopping a trustee's sale so that an action contesting default can take place").

## B.   Factual Background

In December 2005, Marquez Vargas purchased his home through an "80/20" mortgage issued by Countrywide Home Loans, Inc. Dkt. No. 42 at 4; Dkt. No. 27 at 9; Dkt. No. 31 at 3.

1   Under an 80/20 mortgage program, the homeowner finances 80 percent of the purchase price with

2   a traditional note and mortgage, while the remaining 20 percent is borrowed in the form of a

3   subordinate home equity line of credit (commonly referred to as a "HELOC"). *See Piland v.*

4   *Nationstar Mortg., LLC*, No. 2:12-CV-00444-MJP, 2013 WL 593790, at *1 (W.D. Wash. Feb. 15,

5   2013).

6         On December 12, 2005, Marquez Vargas accordingly executed a Home Equity Credit Line

7   Agreement and Disclosure Statement (the "Note") with a credit limit of $59,900—a limit he

8   immediately reached in purchasing the home. Dkt. No. 42-1 at 18, 24; *see id.* at 5 (loan history

9   summary reflecting origination fee of $217.60, closing cost fee of $41, and initial draw of

10   $59,641.40); Dkt. No. 27-5 at 110–11 (initial draw acknowledgment for full $59,900 limit, and

11   statement of borrower's benefits indicating that loan was for "purchasing new home"). The Note

12   is endorsed in blank. Dkt. No. 42-1 at 24. Marquez Vargas simultaneously executed a companion

13   document titled "Important Terms of Our Home Equity Line of Credit" (the "Loan Terms

14   Agreement"). Dkt. No. 27-5 at 85–90. He secured the Note with a deed of trust on his home (the

15   "Deed of Trust"), which repeatedly cross-references "the Note" and defines it as "the Home Equity

16   Credit Line Agreement and Disclosure Statement . . . dated December 07, 2005." *See* Dkt. No. 42-

17   1 at 20, 26–30. The Deed of Trust names Landsafe Title of Washington as trustee and the Mortgage

18   Electronic Registration System Inc. ("MERS") as beneficiary "acting solely as nominee" for

19   Countrywide Home Loans. Dkt. No. 42-1 at 26; *see also* Dkt. No. 27-5 at 101 (MERS disclosure

20   statement).[2]

21   _____

22   [2] In the mid-1990s, several large players in the mortgage industry formed MERS to "maintain a private electronic registration system for tracking ownership of mortgage-related debt." *Bain*, 285 P.3d at 36. MERS customers include "lenders, debt servicers, and financial institutes that trade in mortgage debt," and the system allows these users to

23   circumvent "the cost and inconvenience of the traditional public recording system[.]" *Id.* In addition to tracking debt ownership, MERS is frequently listed by its customers as the beneficiary of the deeds of trust that secure their interests

24   in the homes securing the debts. *Id.* The initial mortgage is typically recorded in the County Clerk's office naming

ORDER GRANTING IN PART, DEFERRING IN PART, AND DENYING IN PART MOTION TO DISMISS,
GRANTING IN PART AND DENYING IN PART MOTION TO CERTIFY, AND DENYING TRO - 4

A couple provisions in the Note and Loan Terms Agreement are relevant here. First, Section 1 of the Note establishes an initial 60-month draw period that is subject to automatic renewal for an additional 60 months. It vests Countrywide Home Loans (and any subsequent holder of the Note) with discretion to terminate or suspend the draw period at an earlier date via timely written notice. Absent the Note holder's affirmative election to that effect, however, the draw period is 120 months. And once the draw period expires, a 180-month repayment period begins:

> **1. LOANS: DRAW AND REPAYMENT PERIOD.** Subject to the limitations explained in this Agreement, upon my request for loans, you agree to lend money to me from time to time until the last day of the sixtieth (60th) consecutive calendar month following the date set forth above ("Initial Draw Period,") or until the last day of any renewed Draw Period, up to my Credit Limit indicated in paragraph 5 below. (You will not make any loans if my Account is sooner terminated or suspended under paragraphs 12.B, 12.D, 13.B or 16.A below.) You will not make any loan before the fourth business day following the signing of this Agreement, except to the extent of proceeds of this loan that are for the purchase or initial construction of the Property.
>
> I agree that prior to the end of the Initial Draw Period, you have the right to review my Account to decide whether such Initial Draw Period will be renewed. Unless you have sent me written notice not later than the sixtieth (60th) day before the Initial Draw Period ends that you have decided not to renew such initial Draw Period, such Initial Draw Period will automatically renew for one additional sixty (60) month period, and the Draw Period on my Account shall thereafter be considered to be 120 months for purposes of this Agreement. If the Initial Draw Period is not renewed, then the Draw Period on my Account shall thereafter be considered to be 60 months for purposes of this Agreement.
>
> After the Draw Period ends, I will no longer be able to obtain loans and then must pay the outstanding balance over the specified Repayment Period unless my Account is sooner terminated under paragraph 12.B below, in which case my Account is due and payable in full at the time of such termination. The Repayment Period shall be 180 months.

---

MERS as the lender's nominee. *Id.* at 40. Over the lifetime of the mortgage, however, the beneficial ownership interest or servicing rights are bought and transferred among MERS customers. *Id.* Instead of being publicly recorded, these assignments are tracked in the MERS system using a "Mortgage Identification Number." *Id.* MERS thus effectively transforms the three-party deed of trust system discussed above into a four-party system, wherein MERS acts as the "contractually agreed upon beneficiary for the lender and its successors and assigns." *Id.*

Dkt. No. 42-1 at 15.[3] Section 4 of the Note further specifies the minimum payment obligations for every billing cycle during the draw period and subsequent repayment period:

**4. PROMISE TO PAY; MINIMUM PAYMENT; METHOD OF PAYMENT.**

A. I promise to pay to your order, when and as due, all loans made under this Agreement, plus all unpaid finance charges, insurance premiums, collection costs and other charges I owe to you now or in the future. I agree to make my payments in the manner specified in my periodic statement and if I do so such payments will be credited as of the day of receipt.

B. At a minimum, you will send me a periodic statement at the end of each billing cycle . . . . The periodic statement will show all Account activity during the billing cycle and contain other important information, including my "New Balance," my Annual Percentage Rate, the amount of my "Minimum Payment Due," my "Payment Due Date" and the place and manner of making payments.

…

E. Unless you terminate my Account and require immediate payment of the entire outstanding balance as provided in paragraph 13.B below, I must pay you at least the "Minimum Payment Due" for each billing cycle by the "Payment Due Date" shown on my periodic statement.

F. During the Draw Period, my "Minimum Payment Due" equals all unpaid finance charges, credit life insurance premiums and other charges imposed during the billing cycle together with any "Amount Past Due." <u>My "Minimum Payment Due" during the Draw Period will not reduce the principal balance that is outstanding on my Account.</u>

G. During the Repayment Period, if the Draw Period on my Account is 60 months or 120 months, my "Minimum Payment Due" equals 1/180th of the outstanding principal balance of my Account as of the last day of the Draw Period plus all unpaid finance charges, credit life insurance premiums and other charges imposed during the billing cycle together with any "Amount Past Due."

*Id.* at 17–18.

The Loan Terms Agreement echoes the Note with respect to these requirements. It too sets the initial draw period at five years and, unless the borrower receives written notice from the lender, that period automatically renews for another five years (for 10 years total). Dkt. No. 27-5

---

[3] Paragraph 13 sets forth the Note holder's right to terminate or accelerate the borrower's account. *Id.* at 21–22.

ORDER GRANTING IN PART, DEFERRING IN PART, AND DENYING IN PART MOTION TO DISMISS, GRANTING IN PART AND DENYING IN PART MOTION TO CERTIFY, AND DENYING TRO - 6

at 85. The agreement also makes clear that payments during the draw period are due "monthly," with the minimum monthly payment equaling "the finance charges that accrued on the outstanding balance during the billing cycle." *Id.* And again, once the draw period concludes, the 15-year repayment period begins: "[D]uring the 15-year repayment period, your payments will be due monthly and your minimum monthly payment will equal 1/180th of the principal balance that was outstanding at the end of the draw period plus finances charges that accrued on the outstanding balance during the billing cycle." *Id.*

Marquez Vargas has not made a payment on the Note since February 2011. *See* Dkt. No. 42 at 8; Dkt. No. 42-1 at 8. At that time, a principal balance of $59,761.05 remained on the loan. Dkt. No. 42 at 8; Dkt. No. 42-1 at 8.[4] In June 2012, MERS conveyed the Deed of Trust to the Bank of New York Mellon. Dkt. No. 42 at 9; Dkt. No. 42-1 at 31–32. Real Time began servicing the loan that November, Dkt. No. 27 at 11, and sent Marquez Vargas at least two monthly billing statements in January and February 2013. *See* Dkt. No. 27-4 at 25–27.

In April 2016, the Bank of New York Mellon sold the Note to RRA—a transaction that was memorialized in June 2016 with a bill of sale. Dkt. No. 27-2 at 42. The accompanying assignment of the Deed of Trust was recorded approximately a year later, in May 2017. Dkt. No. 42-1 at 33. Real Time meanwhile continued to send Marquez Vargas collection letters and loan statements. *See* Dkt. No. 27-2 at 45–112 (June 2018–September 2019 loan statements); Dkt. No. 27-3 at 2–114 (October 2018–February 2022 loan statements); Dkt. No. 27-4 at 55–57, 60–84, 87–94, 99–102 (collection letters dated between October 2015 and November 2021); Dkt. No. 27-5 at 27–31, 36–38 (September 2021, February 2022, and March 2022 collection letters).

---

[4] BAC Home Loans Servicing LP, a subsidiary of Bank of America, serviced the Note between December 2005 and July 2011. Dkt. No. 27 at 10; *see* Dkt. No. 42-1 at 5–9 (Bank of America loan summary). It transferred the Note to Bank of America on July 1, 2011. Dkt. No. 27 at 10–11.

ORDER GRANTING IN PART, DEFERRING IN PART, AND DENYING IN PART MOTION TO DISMISS, GRANTING IN PART AND DENYING IN PART MOTION TO CERTIFY, AND DENYING TRO - 7

1          On May 9, 2022, North Star Trustee, LLC (the current trustee of the Deed of Trust)

2   executed and served a Notice of Default on Marquez Vargas. Dkt. No. 42 at 12; Dkt. No. 27 at 11.

3   And on July 15, 2022, it executed and served a Notice of Foreclosure and Notice of Trustee's Sale

4   for his property. Dkt. No. 42 at 12; Dkt. No. 27 at 11–12; *see* Dkt. No. 27-7 at 2–5. The trustee's

5   sale notice indicated that a $58,101 principal balance remained on the Note, "together with interest

6   as provided in the note or other instrument secured from 4/25/2016, and such other costs and fees

7   as are due under the note or other instrument secured, and as are provided by statute." Dkt. No.

8   27-7 at 3 (itemizing $52,336.51 in monthly payments due between May 25, 2016 and July 1, 2022,

9   $2,682.09 for legal fees, and $4,682.23 for late charges).

10          On October 11, 2022, Marquez Vargas sued RRA, Real Time, and North Star in federal

11   district court. Dkt. No. 1.[5] He seeks to quiet title to his property and alleges that Defendants

12   violated the Fair Debt Collection Practices Act (the "FDCPA"), 15 U.S.C. §§ 1692e, 1692e(2),

13   1692e(5), 1692e(10), 1692d(4), 1692f, 1692f(1), and 1692f(6); Washington's Collection Agency

14   Act (the "WCAA"), Wash. Rev. Code §§ 19.16.110, 19.16.250(15), 19.16.250(16), 19.16.250(21),

15   19.16.250(23), and 19.16.260(1)(a); and Washington's Consumer Protection Act (the "CPA"),

16   Wash. Rev. Code § 19.86 *et seq.* Dkt. No. 42 at 13–25. Marquez Vargas asks the Court to award

17   actual and statutory damages, issue declaratory relief, and enjoin Defendants' allegedly unlawful

18   collection tactics. *Id.* at 21, 25.

19          Defendants moved to dismiss the complaint. Dkt. No. 27. Although the trustee's sale was

20   originally scheduled for November 18, 2022, the parties agreed to postpone it to March 3, 2023.

21   Dkt. No. 27-7 at 2; Dkt. No. 43 at 2. Marquez Vargas, however, moved for a temporary restraining

22

23   ---
[5] Marquez Vargas filed an amended complaint on December 5, 2022, Dkt. No. 26, and a second amended complaint on January 30, 2023, Dkt. No. 42. Although Defendants' motion to dismiss antedates the second amended complaint, the parties agree that this latest amendment does not moot the motion. *See* Dkt. No. 39 at 1–2; Dkt. No. 40 at 1; Dkt. No. 41.

24

ORDER GRANTING IN PART, DEFERRING IN PART, AND DENYING IN PART MOTION TO DISMISS, GRANTING IN PART AND DENYING IN PART MOTION TO CERTIFY, AND DENYING TRO - 8

order to halt the trustee's sale and "preserve the status quo until the Court can adjudicate [his] claims." Dkt. No. 43 at 2; *see* Wash. Rev. Code. § 61.24.130(1). He also moved to certify two allegedly novel issues of state law to the Washington Supreme Court. Dkt. No. 50 at 2. Meanwhile, and following further negotiations, the parties agreed to enjoin the trustee's sale for the duration of this case so long as Marquez Vargas tenders monthly deposits of $700 to the Clerk of Court. Dkt. No. 51 at 2; *see* Dkt. No. 52 at 1–2 (order granting stipulation to enjoin trustee's sale).

## II.    DISCUSSION

The Court first addresses Defendants' motion to dismiss. It then explains why certification is warranted.

### A.    Motion to Dismiss

Dismissal under Rule 12(b)(6) may be based on either the lack of a cognizable legal theory or the absence of sufficient facts alleged under a cognizable legal theory. *Shroyer v. New Cingular Wireless Servs., Inc.*, 622 F.3d 1035, 1041 (9th Cir. 2010). At this stage, the Court accepts as true all factual allegations in the complaint and construes them in the light most favorable to the nonmoving party. *Shooter v. Arizona*, 4 F.4th 955, 957 (9th Cir. 2021). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Although detailed factual allegations are not required, a complaint must include "more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Id.*; *see also Benavidez v. Cnty. of San Diego*, 993 F.3d 1134, 1145 (9th Cir. 2021).

### 1.   Consideration of Materials Outside the Complaint

Defendants attach to their motion exhibits totaling nearly 500 pages. *See* Dkt. Nos. 27-2 to 27-7. Although some of the documents are duplicates, the Court itemizes each below to aid its analysis of whether it can consider them on a motion to dismiss.

(a) *The Proffered Exhibits*

Exhibit 1-1 consists of an October 7, 2022 letter from Real Time's general counsel to Marquez Vargas' attorney, Dkt. No. 27-2 at 2–5; a Bank of America loan history summary, *id.* at 6–10; a Real Time loan history summary, *id.* at 11–15; the collection agreement between RRA and Real Time, *id.* at 16–19; the Note, *id.* at 20–30; the Deed of Trust, *id.* at 31–35; the June 27, 2012 assignment conveying the Deed of Trust from MERS to the Bank of New York Mellon, *id.* at 36–37; the May 23, 2017 assignment conveying the Deed of Trust from the Bank of New York Mellon to RRA, *id.* at 38; a July 28, 2016 letter from Real Time to Marquez Vargas apprising him of the sale of his home equity loan to RRA, *id.* at 39–41; the June 28, 2016 bill of sale conveying the Note from the Bank of New York Mellon to RRA, *id.* at 42; and Real Time loan statements for June 2018 through September 2019, *id.* at 45–112.

Exhibit 1-2 is comprised of Real Time loan statements for October 2018 through February 2022. Dkt. No. 27-3 at 2–114.

Exhibit 1-3 contains Real Time loan statements for February 2022 through July 2022, Dkt. No. 27-4 at 2–24; Real Time monthly billing statements from January and February 2013, *id.* at 25–27; the initial draw acknowledgement for $59,900, *id.* at 28; escrow documents related to the Note, *id.* at 29–42; a November 2012 letter from Real Time notifying Marquez Vargas that collection duties associated with his home equity loan were being transferred from Countrywide Home Loans to Real Time, *id.* at 43–45; an October 2012 letter from Bank of America notifying Marquez Vargas that his home equity loan was being transferred to Real Time, *id.* at 46–48; an undated letter from Bank of America notifying Marquez Vargas that, effective July 1, 2011, his home equity loan was being transferred from BAC Home Loans Servicing LP to Bank of America, *id.* at 49–52; Real Time privacy notices for July 2017, July 2018, July 2019, June 2020, and June 2021, *id.* at 53–54, 58–59, 85–86, 95–96, 97–98; Real Time collection letters for October 2015,

April 2016, April 2017, October 2017, April 2018, October 3, 2018, October 5, 2018, April 2019, June 2019, September 2019, March 19, 2020, March 26, 2020, September 2020, March 2021, and November 2021, *id.* at 55–57, 60–84, 87–94, 99–102; a Real Time loan history summary, *id.* at 103–106; and a Bank of America loan history summary, *id.* at 107–110.

As for Exhibit 1-4, it is comprised of a Bank of America loan history summary and copies of the Note, Deed of Trust, and two assignments of the Deed of Trust. Dkt. No. 27-5 at 2–25. It also includes a November 2021 Real Time letter notifying Marquez Vargas that Real Time had received his "inquiry" and was "researching [his] account," *id.* at 26; Real Time collection letters for September 2021 and March 2022, *id.* at 27–29, 36–38; a February 2022 Real Time collection letter notifying Marquez Vargas that Real Time had reviewed his Loss Mitigation Application and that he qualified for three repayment options, *id.* at 30–31; a January 2022 Real Time letter notifying Marquez Vargas that Real Time had received his Loss Mitigation Application, *id.* at 32–33; a June 2022 Real Time privacy notice, *id.* at 34–35; an August 2022 Real Time letter to Marquez Vargas' counsel with loan account information, *id.* at 39; a November 2021 Real Time letter to Marquez Vargas attaching a loan summary and copies of the transaction history, Note, and two assignments of the Deed of Trust, *id.* at 40–72; a Real Time loan history summary, *id.* at 73–77; and copies of the loan application disclosure acknowledgements, Billing Rights Rider, affiliated business arrangement disclosure statement, notice of right to cancel, warning regarding notice of right to cancel, Loan Terms Agreement, estimate of charges, flood hazard determination, settlement statement, borrower signature and certification, borrower authorization, MERS disclosure statement, documents correction and fee agreement, hazard insurance requirements, borrower acknowledgement, confirmation agreement, initial draw acknowledgment, statement of borrower's benefits, and appraisal disclaimer, *id.* at 78–112.

Exhibit 2 is a copy of the April 2022 Declaration of Note Holder. Dkt. No. 27-6 at 2. And last, Exhibit 3 is a copy of the July 2022 Notice of Trustee's sale. Dkt. No. 27-7 at 2–5.

### (b) Legal Standard

District courts generally may not consider any material beyond the pleadings when ruling on a Rule 12(b)(6) motion. *Lee v. City of Los Angeles*, 250 F.3d 668, 688 (9th Cir. 2001); *accord Van Buskirk v. Cable News Network, Inc.*, 284 F.3d 977, 980 (9th Cir. 2002) ("Ordinarily, a court may look only at the face of the complaint to decide a motion to dismiss."). And if the Court does consider "matters outside the pleadings," it must treat the motion to dismiss as a motion for summary judgment and give all parties "a reasonable opportunity to present all the material that is pertinent to the motion." Fed. R. Civ. P. 12(d). There are exceptions to this general rule. A district court may consider "documents attached to the complaint, documents incorporated by reference in the complaint, or matters of judicial notice—without converting the motion to dismiss into a motion for summary judgment." *United States v. Ritchie*, 342 F.3d 903, 908 (9th Cir. 2003). These exceptions are designed to prevent plaintiffs from deliberately omitting documents on which their claims are based in order to survive a motion to dismiss. *Swartz v. KPMG LLP*, 476 F.3d 756, 763 (9th Cir. 2007).

A document "may be incorporated by reference into a complaint if the plaintiff refers extensively to the document or the document forms the basis of the plaintiff's claim." *Ritchie*, 342 F.3d at 908; *see also Garner v. Amazon.com, Inc.*, 603 F. Supp. 3d 985, 992 (W.D. Wash. 2022) ("Mere reference to a document in the complaint is not sufficient[;] rather, the document must be integral to or form the basis of plaintiff's claims."). The Ninth Circuit has distilled the inquiry into a three-part test: (1) the complaint must refer to the document; (2) the document must be central to the plaintiff's claim; and (3) the document's authenticity cannot be disputed by either party. *Daniels-Hall v. Nat'l Educ. Ass'n*, 629 F.3d 992, 998 (9th Cir. 2010). However, the "incorporation

by reference" doctrine has been extended to situations in which the plaintiff does not expressly

reference the document or allege its contents in the complaint. A district court may still consider a

document pursuant to the doctrine when "the plaintiff's claim depends on the contents of [the]

document, the defendant attaches the document to its motion to dismiss, and the parties do not

dispute the authenticity of the document, even though the plaintiff does not explicitly allege the

contents of that document in the complaint." *Knievel v. ESPN*, 393 F.3d 1068, 1076 (9th Cir. 2005);

*accord Benanav v. Healthy Paws Pet Ins., LLC*, 495 F. Supp. 3d 987, 992 (W.D. Wash. 2020).

### *(c)  Documents Considered*

Marquez Vargas attaches to his second amended complaint the October 7, 2022 attorney

correspondence, the Bank of America loan history summary, the Real Time loan history summary,

the Note, the Billing Rights Rider, the Deed of Trust, and the two assignments of the Deed of

Trust. *See* Dkt. No. 42-1 at 1–33; *see also* Dkt. No. 27-5 at 79. The Court therefore considers these

documents. *See Ritchie*, 342 F.3d at 908. Aside from that, Defendants contend that the Court may

also consider the April 2022 Declaration of Note Holder and July 2022 Notice of Trustee Sale.

Dkt. No. 27 at 11 n.3, 12 n.4; *see* Dkt. No. 27-6 at 2; Dkt. No. 27-7 at 2–5. The Court agrees.

Marquez Vargas' second amended complaint references both documents, they are integral to his

claims, and he does not dispute their authenticity. *See Daniels-Hall*, 629 F.3d at 998; Dkt. No. 42

at 11–12, 24 (referencing documents).[6]

Defendants do not advance an argument in support of the remaining documents attached

to their motion to dismiss. The Court has, however, thoroughly reviewed each of the proffered

exhibits and concludes that it may consider the following documents without converting

---

[6] The Court also takes judicial notice of the Notice of Trustee Sale. *See Petheram v. Wells Fargo Bank*, No. C13-1016-JLR, 2013 WL 4761049, at *5 (W.D. Wash. Sept. 3, 2013) (taking judicial notice of Notice of Trustee Sale); *Reyn's Pasta Bella, LLC v. Visa USA, Inc.*, 442 F.3d 741, 746 n.6 (9th Cir. 2006) (courts routinely take judicial notice of public records).

1  Defendants' motion to dismiss into a motion for summary judgment: all Real Time collection

2  letters and loan statements, Dkt. No. 27-2 at 45–112; Dkt. No. 27-3 at 2–114; Dkt. No. 27-4 at 2–

3  24, 25–27, 55–57, 60–84, 87–94, 99–102; Dkt. No. 27-5 at 27–31, 36–38; the June 28, 2016 bill

4  of sale conveying the Note from the Bank of New York Mellon to RRA, Dkt. No. 27-2 at 42; the

5  initial draw acknowledgement for $59,900, Dkt. No. 27-4 at 28; and the Loan Terms Agreement,

6  *id.* at 85–90. As to the collection letters and loan statements, the second amended complaint

7  references Real Time's "one or more monthly statements . . . from March 2017 through January

8  2021 . . . seeking to collect a debt," and alleges that "any communication to Mr. Marquez Vargas

9  that included amounts that were not owed . . . w[as] an attempt to trick [him] into resuming

10 payments that were not owed to restart the statute of limitations." Dkt. No. 42 at 18. At least some

11 of his consumer protection claims thus turn on the collection letters and other loan statements. And

12 he does not dispute the authenticity of those documents. *Daniels-Hall*, 629 F.3d at 998. So too

13 with respect to the bill of sale, initial draw acknowledgment, and Loan Terms Agreement.

14 Although Marquez Vargas does not expressly reference these documents or allege their contents

15 in his complaint, his quiet title claim—namely, his argument that (1) the limitations period has run

16 on the Note and (2) the Note is not a negotiable instrument under Washington's Uniform

17 Commercial Code ("WUCC")—depends on these documents, and nowhere does he challenge their

18 authenticity. *See Knievel*, 393 F.3d at 1076. The Court declines to consider any other documents

19 at this stage.

20      2.  <u>Merits</u>

21      The Court now turns to the merits of the dispute. As noted above, Marquez Vargas seeks

22 to quiet title to his property and alleges violations of state and federal consumer protection laws.

23 The Court addresses them in turn.

24

ORDER GRANTING IN PART, DEFERRING IN PART, AND DENYING IN PART MOTION TO DISMISS, GRANTING IN PART AND DENYING IN PART MOTION TO CERTIFY, AND DENYING TRO - 14

*(a) Quiet Title*

Marquez Vargas' quiet title action is premised on two theories. First, he suggests that Washington's six-year limitations period has run on the Note because any claim to recoup the debt accrued "upon discovery of [his] breach," i.e., his initial delinquency. Dkt. No. 42 at 15; *see id.* at 14 ("No payments at this time are due as the HELOC is completely barred by the six-year statute of limitations for contracts[.]"). Second, he argues that RRA cannot foreclose on the Note without first authenticating the chain of assignments. *Id.* at 15–16. This latter contention is premised on his belief that the Note is not a "negotiable instrument" under the WUCC and, by extension, that RRA is not the "holder" of the Note and thus cannot be the "beneficiary" with authority to initiate nonjudicial foreclosure proceedings. *Id.* at 15.

(i) The Statute of Limitations Has Not Run on the Note

"When an action for foreclosure on a deed of trust is barred by the statute of limitations, RCW 7.28.300 authorizes an action to quiet title." *Westar Funding, Inc. v. Sorrels*, 239 P.3d 1109, 1113 (Wash. Ct. App. 2010); *see, e.g.*, *Jarvis v. Fed. Nat'l Mortg. Ass'n*, 726 F. App'x 666, 667 (9th Cir. 2018). Washington law imposes a six-year limitations period on the enforcement of a promissory note. Wash. Rev. Code § 4.16.040(1); *see Cedar W. Owners Ass'n v. Nationstar Mortg., LLC*, 434 P.3d 554, 559 (Wash. Ct. App. 2019) (the promissory note and the deed of trust are written contracts subject to the general six-year limitations period). "For a deed of trust, the six-year statute of limitations begins to run when the party is entitled to enforce the obligations of the note." *Wash. Fed. v. Azure Chelan LLC*, 382 P.3d 20, 30 (Wash. Ct. App. 2016).[7]

RRA's ability to enforce the debt turns on whether the Note is a demand or installment note. *Copper Creek*, 508 P.3d at 187. A demand note is mature at its inception, *Cedar W.*, 434

---

[7] It is important to acknowledge that the note is an obligation separate from the deed of trust: the note represents the

ORDER GRANTING IN PART, DEFERRING IN PART, AND DENYING IN PART MOTION TO DISMISS, GRANTING IN PART AND DENYING IN PART MOTION TO CERTIFY, AND DENYING TRO - 15

P.3d at 559, meaning the limitations period runs from the date of execution, *4518 S. 256th, LLC v. Karen L. Gibbons, P.S.*, 382 P.3d 1, 6 (Wash. Ct. App. 2016). An installment note, on the other hand, is payable in installments and matures on a future date. *Copper Creek*, 508 P.3d at 187. "When recovery is sought on an obligation payable by installments, the statute of limitations runs against each installment from the time it becomes due; that is, from the time when an action might be brought to recover it." *Merceri v. Bank of New York Mellon*, 434 P.3d 84, 87 (Wash. Ct. App. 2018) (cleaned up). Put differently, "[t]he note holder has six years from default on an installment to enforcement payment of that installment," *Copper Creek*, 508 P.3d at 187, and "the final six-year period to take an action related to the debt does not begin to run until it fully matures," *Merceri*, 434 P.3d at 87.

The Note is an installment note. It has a maximum term of 25 years (if the initial five-year draw period automatically renews) and a minimum term of 20 years (if the holder provides timely written notice exercising its right to not renew the draw period). *See* Dkt. No. 42-1 at 15. Because the draw period automatically renewed here, the Note will not mature until December 2030. And, as detailed above, the Note contemplates a billing cycle for both the draw period and the repayment period. *See id.* at 17–18. The Loan Terms Agreement makes clear that Marquez Vargas is obligated to make monthly payments (i.e., installments) on the Note. *See* Dkt. No. 27-5 at 85 ("During the draw period, your payments will be due monthly, and your minimum monthly payment will equal the finance charges that accrued on the outstanding balance during the billing cycle."); *id.*

---

debt, whereas the deed of trust serves as security for payment of the debt. *Copper Creek (Marysville) Homeowners Ass'n v. Kurtz*, 508 P.3d 179, 185 (Wash. Ct. App. 2022); *accord OneWest Bank, FSB v. Erickson*, 367 P.3d 1063, 1078 n.14 (Wash. 2016). "The holder of the promissory note has the authority to enforce the deed of trust because the deed of trust follows the note by operation of law." *Winters v. Quality Loan Serv. Corp. of Wash., Inc.*, 454 P.3d 896, 904 (Wash. Ct. App. 2019). The Court further recognizes that either the note or the deed of trust "may be the basis of an action." *Am. Fed. Sav. & Loan Ass'n of Tacoma v. McCaffrey*, 728 P.2d 155, 161 (Wash. 1986). Put differently, "enforcement of a promissory note and foreclosure of a deed of trust securing that note are separate remedies of a creditor in the event of a borrower's default. The inability to pursue one remedy does not bar the other." *Edmundson v. Bank of Am., N.A.*, 378 P.3d 272, 276 (Wash. Ct. App. 2016) (footnote omitted).

("[D]uring the 15-year repayment period, your payments will be due monthly and your minimum monthly payment will equal 1/180th of the principal balance that was outstanding at the end of the draw period plus finance charges that accrued on the outstanding balance during the billing cycle."); *see also Merritt v. USAA Fed. Sav. Bank*, 532 P.3d 1024, 1030–31 (Wash. 2023); *Taylor v. PNC Bank, Nat'l Ass'n*, No. C19-1142-JCC, 2019 WL 4688804, at *2 (W.D. Wash. Sept. 26, 2019). Marquez Vargas does not contend that RRA or any previous holder accelerated the maturation date pursuant to Section 13 of the Note. *See* Dkt. No. 42-1 at 21.[8]

The statute of limitations thus does not bar recovery of installments that became due within six years of RRA's resort to remedies under the DTA, i.e., commencement of nonjudicial foreclosure proceedings. *Copper Creek*, 508 P.3d at 188–89; *see* Wash. Rev. Code § 61.24.030 (listing procedural prerequisites for trustee sale). This is because commencement of nonjudicial foreclosure proceedings tolls the statute of limitations. *Cedar W.*, 434 P.3d at 562; *Bingham v. Lechner*, 45 P.3d 562, 566 (Wash. Ct. App. 2002). The Court acknowledges that exactly when the proceedings toll the limitations period is a factual inquiry, and a notice of default does not always stop the clock. *Cedar W.*, 434 P.3d at 562; s*ee also Renfroe v. Citibank, NA*, 776 F. App'x 415, 418 (9th Cir. 2019). Here, though, RRA diligently pursued and attempted to perfect its nonjudicial foreclosure remedies. North Star served Marquez Vargas with the Notice of Default on May 9, 2022, and then recorded and served the Notice of Trustee's sale roughly two months later, on July 15, 2022. Dkt. No. 42 at 12; Dkt. No. 27 at 11; *see Cedar W.*, 434 P.3d at 562 (after filing a notice of default, the note holder "must act diligently to pursue and perfect nonjudicial foreclosure remedies under the [DTA]"). The May 9, 2022 Notice of Default therefore tolled the statute of limitations. *Cf. Cedar W.*, 434 P.3d at 562 (notice of trustee's sale, rather than notice of default,

---

[8] When an installment note is accelerated, "the entire remaining balance becomes due and the statute of limitations is triggered for all installments that had not previously become due." *4518 S. 256th, LLC*, 382 P.3d at 6.

ORDER GRANTING IN PART, DEFERRING IN PART, AND DENYING IN PART MOTION TO DISMISS, GRANTING IN PART AND DENYING IN PART MOTION TO CERTIFY, AND DENYING TRO - 17

1  tolled the limitations period because note holder took no steps to pursue nonjudicial foreclosure

2  "for over a year after the notice of default was transmitted to the borrower").

3       Therefore, if RRA is a "beneficiary" under the DTA, it may recoup any installments that

4  became delinquent on or after May 9, 2016 through enforcement of the Deed of Trust—that is, the

5  nonjudicial foreclosure sale of Marquez Vargas' property. Although any installments that were

6  outstanding prior to May 9, 2016 (i.e., time-barred installments) are not enforceable in the

7  foreclosure proceeding, *see Copper Creek*, 508 P.3d at 187, 191–92; *Eng v. Specialized Loan

8  Servicing*, 500 P.3d 171, 178–79 (Wash. Ct. App. 2021); *Cedar W.*, 434 P.3d at 562–63, that is not

9  an issue here: the Notice of Default and Notice of Trustee's Sale do not seek monthly payments

10  that became due before May 9, 2016. Rather, the targeted debt is limited to delinquent payments

11  due between May 25, 2016, and July 1, 2022. *See* Dkt. No. 42 at 12; Dkt. No. 27-7 at 3.

12       Finally, the Court rejects Marquez Vargas' argument that the entire debt is time-barred

13  because the Note is not a negotiable instrument. Dkt. No. 42 at 15; *see* Dkt. No. 31 at 12 ("The

14  Defendants misread the law by insisting that the statute of limitations applicable to installment

15  notes applies to a non-negotiable HELOC Agreement for revolving debt lacking a fixed amount

16  owed and not payable in fixed equal installment[s] for a term certain.").[9] As discussed above,

17  Washington courts apply Section 4.16.040(1)'s six-year limitations period to all promissory notes

18  (written contracts) without reference to negotiability. *See Cedar W.*, 434 P.3d at 559; *Edmundson*,

19  378 P.3d at 276. Marquez Vargas cites no authority to the contrary. The sole inquiry for purposes

20  of the statute of limitations is whether the promissory note at issue is a demand or installment note.

21  And because the Note is an installment note, the six-year limitations period commenced on each

22

23  ───────────────
    [9] Under Article 3 of the WUCC, "an action to enforce the obligation of a party to pay a note payable at a definite time must be commenced within six years after the due date or dates stated in the note or, if a due date is accelerated, within six years after the accelerated due date." Wash. Rev. Code § 62A.3-118(a); *see id.* § 62A.3-102(a) (Article 3 of the WUCC applies to negotiable instruments).

24

ORDER GRANTING IN PART, DEFERRING IN PART, AND DENYING IN PART MOTION TO DISMISS, GRANTING IN PART AND DENYING IN PART MOTION TO CERTIFY, AND DENYING TRO - 18

monthly payment as it became due. *Merceri*, 434 P.3d at 87. This portion of Marquez Vargas'
quiet title action fails.

(ii) Marquez Vargas Cannot Prevail on the Strength of His Own Title

Marquez Vargas next argues that RRA lacks standing to initiate nonjudicial foreclosure
proceedings because the Note is not a negotiable instrument under the WUCC. Dkt. No. 42 at 15–
16; Dkt. No. 31 at 7–9.

Before a notice of trustee's sale is recorded, the DTA requires the trustee to "have proof
that the beneficiary is the holder of any promissory note or other obligation secured by the deed of
trust." Wash. Rev. Code § 61.24.030(7)(a). A declaration made by the beneficiary under penalty
of perjury attesting that it is such a holder "shall be sufficient proof[.]" *Id.*[10] And the DTA defines
"beneficiary" as "the holder of the instrument or document evidencing the obligations secured by
the deed of trust[.]" Wash. Rev. Code § 61.24.005(2). The gist of Marquez Vargas' theory is that
RRA cannot be a "beneficiary" for purposes of the statute because it is not a "holder" as that term
is defined in the WUCC; specifically, RRA cannot be a "holder" because the Note is not a
"negotiable instrument." Dkt. No. 31 at 9–11; *see also* Wash. Rev. Code § 62A.3-301 (the person
entitled to enforce an instrument is the "holder of the instrument"). Put differently, Marquez
Vargas contends that the DTA's nonjudicial foreclosure remedy is available only for negotiable
instruments, while non-negotiable instruments must be foreclosed judicially. Dkt. No. 31 at 11;
*see also, e.g.*, *McDonald v. OneWest Bank, FSB*, 929 F. Supp. 2d 1079, 1088 (W.D. Wash. 2013)
("Even if defendants are ultimately unable to utilize the expedited DTA procedure . . . , they would
be entitled to initiate a judicial foreclosure action and, if applicable, to seek a deficiency judgment

---

[10] The record contains a declaration signed under penalty of perjury by David Rosas (Director of Loss Mitigation at Real Time, which is RRA's attorney-in-fact and the servicer of the Note) indicating that RRA is the holder of the Note. *See* Dkt. No. 27-6 at 2.

against plaintiff for any unrecovered amounts."); Wash. Rev. Code § 61.12.040 (providing for judicial foreclosure).[11]

But a quiet title action is not the proper mechanism for remedying this alleged deficiency. Rather, because a quiet title action is "designed to resolve competing claims of ownership," *Kobza v. Tripp*, 18 P.3d 621, 623–24 (Wash. Ct. App. 2001); *accord Byrd v. Pierce Cnty.*, 425 P.3d 948, 956 (Wash. Ct. App. 2018), a quiet title plaintiff must prevail on the strength of his own title, not the weakness of the opposing party's title, *Wash. State Grange v. Brandt*, 148 P.3d 1069, 1077 (Wash. Ct. App. 2006). That typically requires the plaintiff to demonstrate that he has paid off the outstanding debt and is the rightful owner of the property. *Niborg v. CitiMortgage, Inc.*, No. C17-5155-BHS, 2017 WL 2119448, at *2 (W.D. Wash. May 16, 2017); *Evans v. BAC Home Loans Servicing LP*, No. C10-0656-RSM, 2010 WL 5138394, at *4 (W.D. Wash. Dec. 10, 2010). As Defendants note, this Marquez Vargas cannot do. *See* Dkt. No. 27 at 16–17; Dkt. No. 46 at 11–13. He does not allege that he has paid off the Note—in fact, he admits that he has not made a single payment since 2011. Dkt. No. 42 at 8. And as discussed above, the limitations period has not expired on delinquent payments that became due after May 9, 2016. Even if RRA is not a lawful "beneficiary" with authority to initiate nonjudicial foreclosure proceedings under the DTA, that

---

[11] Defendants contend that Marquez Vargas lacks standing to challenge the assignment of his loan documents. Dkt. No. 27 at 26; Dkt. No. 46 at 8. It is true that a borrower generally lacks standing to challenge the chain of assignments unless he or she has a genuine claim that they are at risk of paying the same debt twice if the assignment stands. *See Saepoff v. N. Cascade Tr. Servs., Inc.*, No. C17-957-RSL, 2020 WL 6381811, at *5 (W.D. Wash. Oct. 30, 2020); *Beck v. Bank Nat'l Ass'n*, No. C17-0882-JLR, 2017 WL 6389330, at *5 (W.D. Wash. Dec. 14, 2017). And Marquez Vargas does not allege that he is subject to such a risk. Defendants, however, misconstrue the aim of his argument. He is not challenging the validity of the chain of assignments; he is challenging RRA's status as a "beneficiary" and, by extension, its authority to initiate nonjudicial foreclosure proceedings under the DTA. *See Lake v. MTGLQ Invs., L.P.*, No. C17-0495-JLR, 2017 WL 3839590, at *5 (W.D. Wash. Sept. 1, 2017) (the power to initiate foreclosure lies with the holder of the note regardless of any assignment of the deed of trust). In other words, Marquez Vargas suggests that RRA must demonstrate valid assignments and a chain of title because it cannot utilize the DTA's expedited remedy. Dkt. No. 31 at 9 (arguing that because non-negotiable instruments may only be assigned "through a writing and in compliance with RCW 4.08.080," enforcement of the debt at issue requires proof of "direct or indirect written assignment" (citing *MRC Receivables Corp. v. Zion*, 218 P.3d 621, 623 (Wash. Ct. App. 2009)); *see also, e.g.*, *Bucci v. Nw. Tr. Servs., Inc.*, 387 P.3d 1139, 1144 (Wash. Ct. App. 2016) ("Bucci contends that because the note falls outside of the UCC, contract law applies and in order to enforce the note USB needs to establish their rights under common law contracts and demonstrate valid assignments and a chain of title from the original lender.").

ORDER GRANTING IN PART, DEFERRING IN PART, AND DENYING IN PART MOTION TO DISMISS, GRANTING IN PART AND DENYING IN PART MOTION TO CERTIFY, AND DENYING TRO - 20

1   speaks, if anything, to the weakness of RRA's title rather than the strength of Marquez Vargas'

2   title. *Cf. Babrauskas v. Paramount Equity Mortg.*, No. C13-0494-RSL, 2013 WL 5743903, at *6

3   (W.D. Wash. Oct. 23, 2013) (rejecting quiet title action based on alleged defect in security

4   instrument creating lien). The second portion of his quiet title action therefore fails along with the

5   first.

6       Finally, the Court cannot award injunctive relief under Section 61.24.130(1) absent an

7   accompanying DTA claim, which is not present here. Courts in this district have repeatedly

8   reminded litigants that injunctive relief is a remedy, not a cause of action. *See, e.g.*, *Sessions v.*

9   *UMB Bank, N.A.*, No. 2:21-CV-01490-LK, 2022 WL 1110282, at *1 (W.D. Wash. Apr. 8, 2022);

10  *Veridian Credit Union v. Eddie Bauer, LLC*, 295 F. Supp. 3d 1140, 1151 (W.D. Wash. 2017);

11  *Kwai Ling Chan v. Chase Home Loans Inc.*, No. C12-0273-JLR, 2012 WL 1252649, at *3 (W.D.

12  Wash. Apr. 13, 2012).

13           *(b) FDCPA Claims*

14      Marquez Vargas advances several bases for liability under the FDCPA. As noted above,

15  his complaint references at least eight different provisions across Sections 1692d, 1692e, and

16  1692f. *See* Dkt. No. 42 at 16–21. A plaintiff asserting an FDCPA claim must allege facts

17  supporting three threshold elements: (1) the plaintiff has been the object of collection activity

18  arising from a consumer debt; (2) the defendant collecting the "debt" is a "debt collector" as

19  defined by the FDCPA; and (3) the defendant engaged in any act or omission in violation of the

20  provisions of the FDCPA. *Aurora Fin. Grp., Inc. v. Tollefson*, No. C20-0297-JLR, 2020 WL

21  4816033, at *6 (W.D. Wash. Aug. 19, 2020); *see also Stimpson v. Midland Credit Mgmt., Inc.*,

22  944 F.3d 1190, 1195 (9th Cir. 2019) ("To prevail on a claim under the FDCPA, a plaintiff must

23  establish that a debt collector, as defined in § 1692a(6), has failed to comply with a provision of

24

1  the FDCPA."). Marquez Vargas' FDCPA claims can be divided into three general theories. The

2  Court addresses them in turn.

3  (i)  Time-Barred Debt

4  Many of Marquez Vargas' FDCPA claims are premised on his theory that the statute of

5  limitations has run on the entire Note. For example, he accuses Defendants of "act[ing] in concert

6  to collect a time barred debt" and "attempt[ing] to trick [him] into resuming payments that were

7  not owed to restart the statute of limitations." Dkt. No. 42 at 17–18. Marquez Vargas also generally

8  alleges that Real Time sent him "misleading mortgage statements" and other communications

9  suggesting that he "still owed the time barred debt[.]" *Id.* at 18. For the reasons discussed above,

10  however, these claims fail as a matter of law because the debt is not time-barred. Any payments

11  that became due after May 9, 2016 remain actionable. And Marquez Vargas does not identify any

12  communications from Real Time seeking to collect delinquent debt predating the eligible payment

13  range specified in the Notice of Default and Notice of Trustee's Sale. Any FDCPA claims that are

14  based on Defendants' efforts to collect an allegedly time-barred debt are dismissed.

15  (ii)  Antecedent Nonjudicial Foreclosure Communications

16  Marquez Vargas also launches a slew of allegations targeting communications and other

17  notices associated with the nonjudicial foreclosure proceedings. As a general matter, however, the

18  Supreme Court has made clear that those who engage only in nonjudicial foreclosure proceedings

19  are not debt collectors for purposes of the FDCPA's panoply of general proscriptions. *See*

20  *Obduskey v. McCarthy & Holthus LLP*, 586 U.S. 466, 473–77 (2019) (explaining that, under

21  Section 1692a(6)'s "limited-purpose" definition, security enforcers are debt collectors only for

22  purposes of Section 1692f(6)). The FDCPA thus applies to foreclosure activities only through

23  Section 1692f(6). *See id.* at 1038 ("[B]ut for § 1692f(6), those who engage in only nonjudicial

24  foreclosure proceedings are not debt collectors within the meaning of the Act."); *Dowers v.*

1   *Nationstar Mortg., LLC*, 852 F.3d 964, 970 (9th Cir. 2017) ("[W]hile the FDCPA regulates

2   security interest enforcement activity, it does so *only* through Section 1692f(6)."); *Mashiri v.*

3   *Epsten Grinnell & Howell*, 845 F.3d 984, 990 (9th Cir. 2017) ("[W]here an entity is engaged solely

4   in the enforcement of a security interest and not in debt collection, . . . it is subject only to

5   § 1692f(6) rather than the full scope of the FDCPA.").[12]

6       To the extent, then, that Marquez Vargas bases his FDCPA claims on Defendants'

7   involvement in enforcing the Deed of Trust on his property, those claims are actionable only under

8   Section 1692f(6). This provision makes it unlawful for a security enforcer to take or threaten to

9   take "any nonjudicial action to effect dispossession or disablement of property if," as relevant here,

10  "there is no present right to possession of the property claimed as collateral through an enforceable

11  security interest." 15 U.S.C. § 1692f(6)(A); *see Aurora*, 2020 WL 4816033, at *7. Marquez Vargas

12  alleges that Defendants' lack the authority to enforce the Note under the DTA. *See, e.g.*, Dkt. No.

13  42 at 17 ("Real Time cannot foreclose the Marquez HELOC because it lacks the present right to

14  possession of the Marquez collateral when they initiated nonjudicial foreclosure against Mr.

15  Marquez."); *id.* at 18 (claiming that Defendants violated the FDCPA by "proclaiming that RRA

16  CP was entitled to foreclose on Plaintiff by claiming it has possession of the original note"). He

17  similarly argues in his opposition brief that "RRA CP and Real Time do not have the ability to

18  prove [that] they can enforce the HELOC" because "the HELOC is not a negotiable instrument[.]"

19

20

---

21  [12] This is not to say that an entity engaged in security interest enforcement enjoys blanket immunity to engage in
    abusive debt-collection practices. "Quite to the contrary, a person who engages in debt collection before, during, or

22  after the judicial foreclosure proceeding is subject to the full panoply of FDCPA prohibitions. But the Act kicks in
    only once a person does 'something *in addition* to the actions required to enforce a security interest.'" *Barnes v. Routh*

23  *Crabtree Olsen PC*, 963 F.3d 993, 999 (9th Cir. 2020) (quoting *Vien-Phuong Thi Ho v. ReconTrust Co., NA*, 858 F.3d
    568, 573 n.5 (9th Cir. 2017)); *see, e.g.*, *Mashiri*, 845 F.3d at 990 ("Because Epsten sent the May Notice as a debt

24  collector attempting to collect payment of a debt—irrespective of whether it also sought to perfect the HOA's security
    interest and preserve its right to record a lien in the future—it is subject to the full scope of the FDCPA[.]").

ORDER GRANTING IN PART, DEFERRING IN PART, AND DENYING IN PART MOTION TO DISMISS,
GRANTING IN PART AND DENYING IN PART MOTION TO CERTIFY, AND DENYING TRO - 23

1   Dkt. No. 31 at 19.[13] Defendants counter that they did not violate subsection 1692f(6) because they

2   had the right to nonjudicially foreclose under the DTA. Dkt. No. 46 at 16.

3          Because resolution of this issue depends on the answer to the certified question, the Court

4   defers its determination of whether Marquez Vargas has stated a claim under Section 1692f(6) of

5   the FDCPA.

6          The Court emphasizes, however, that Defendants' potential FDCPA liability for conduct

7   associated with the nonjudicial foreclosure proceedings is strictly limited to Section 1692f(6). Such

8   conduct includes any antecedent steps required under state law for enforcement of the security

9   interest, such as "providing the debtor with notice that failure to repay could lead to the loss of

10   one's home." *Barnes*, 963 F.3d at 999; *see also Ho*, 858 F.3d at 572 (actions taken to facilitate

11   non-judicial foreclosure, such as sending the notice of default and notice of sale, are considered

12   enforcement of the security interest and are exempt from the FDCPA's general code of conduct);

13   *Dwyer v. Trinity Fin. Servs., LLC*, No. C20-1236-JLR-SKV, 2021 WL 3727835, at *5 (W.D.

14   Wash. Aug. 6, 2021) ("A loan servicer attempting to work out a loan in default by sending the

15   borrower a letter informing the borrower of the default and explaining a variety of potential

16   payment options is likewise not debt collection under the statute."). A handful of Marquez Vargas'

17   allegations fail under this rubric. For example, he claims that North Star "falsely represented to

18   the general public that RRA CP was entitled to claim 8.5% interest when it was not due any interest

19   at all." Dkt. No. 42 at 20. The Court surmises that this allegedly false representation to the "general

20   public" refers to the Notice of Trustee's Sale, which North Star recorded and served on Marquez

21

22

23

24

---

[13] Marquez Vargas' allegation that Real Time lacked authority to initiate nonjudicial foreclosure proceedings misses the mark. Real Time is the servicer of the Note, not the holder or owner. RRA is the purported holder and, by extension, the entity claiming beneficiary status with authority to enforce the Note. *See* Dkt. No. 27-6 at 2. Wash. Rev. Code § 61.24.030(7)(a). And it is RRA, the purported beneficiary, that claims authority to appoint a trustee or successor trustee. *See id.* § 6.24.010(2).

ORDER GRANTING IN PART, DEFERRING IN PART, AND DENYING IN PART MOTION TO DISMISS, GRANTING IN PART AND DENYING IN PART MOTION TO CERTIFY, AND DENYING TRO - 24

Vargas, and perhaps the Notice of Default and Notice of Foreclosure (although the complaint suggests that the latter two documents were simply served on Marquez Vargas, rather than recorded). *See id.* at 12; Dkt. No. 27-7 at 2–5. Notices such as these fall within the umbrella of security interest enforcement and must be addressed, if at all, through Section 1692f(6). *See Barnes*, 963 F.3d at 999. But Marquez Vargas does not even reference Section 1692f(6) with respect to North Star. To the extent he seeks to hold North Star liable pursuant to the FDCPA's general code of conduct, this claim is dismissed. *See Hundal v. Eagle Vista Equities, LLC*, 726 F. App'x 543, 544–45 (9th Cir. 2018) (foreclosure trustees do not fall under the FDCPA's general definition of "debt collectors" when they perform foreclosure procedures provided by state law).[14]

Marquez Vargas also argues, in passing, that Defendants violated Section 1692d(4) by (1) "[r]epresenting or implying that nonpayment of [the] debt w[ould] result in seizure of [his] property" and (2) attempting to nonjudicially foreclose on his property. Dkt. No. 31 at 19. Section 1692d(4) prohibits "[t]he advertisement for sale of any debt to coerce payment of the debt." Defendants did not advertise the sale of the Note debt. To the extent Marquez Vargas suggests that the predicate notices associated with the nonjudicial foreclosure proceedings constitute advertisements for sale of the debt, any such claim fails as a matter of law because a nonjudicial foreclosure sale is not a sale of the debt itself. *See Ho*, 858 F.3d at 572 (nonjudicial foreclosure retakes and resells the security, not the debt). Moreover, the Court reiterates that such

---

[14] Marquez Vargas nonetheless alleges that North Star is a "debt collector" under the FDCPA "because nonjudicial foreclosure is a means of collecting a debt, whether directly or indirectly." Dkt. No. 42 at 3. Although the Supreme Court in *Obduskey* held that nonjudicial foreclosure constitutes an indirect attempt to collect a debt, 586 U.S. at 475, it confirmed longstanding Ninth Circuit authority that those engaged solely in security-interest enforcement are not, outside of Section 1692f(6), debt collectors for purposes of the FDCPA. Marquez Vargas is correct that nonjudicial foreclosure is a form of debt collection, but incorrectly concludes that North Star is therefore a debt collector under the FDCPA. The allegations against North Star appear limited to the actions it took as trustee to facilitate the enforcement of a security interest. *See* Dkt. No. 42 at 12 ("North Star Trustee, LLC prepared and served a Notice of Default on Mr. Marquez on or around May 9, 2022."); *id.* ("North Star Trustee, LLC prepared, served, and recorded a Notice of Trustee's Sale on or about July 15, 2022 as King Country Instrument 20220715000341.").

communications are part and parcel of the enforcement of the security interest and thus give rise to FDCPA liability, if at all, under Section 1692f(6) alone.

The Court next addresses the complaint's passing reference to Section 1692e(5), which Marquez Vargas fails to support with specifically tailored allegations. This provision prohibits debt collectors from threatening "to take any action that cannot legally be taken or that is not intended to be taken." As a threshold matter, the Court rejects any suggestion that Defendants acted deceptively in apprising Marquez Vargas that he could be foreclosed upon if he did not fulfill his obligations on the secured Note. *See Nelson v. Specialized Loan Servicing, LLC*, No. 3:20-CV-05461-RBL, 2020 WL 5065292, at *3 (W.D. Wash. Aug. 27, 2020). Such representations are neither false nor deceptive because he defaulted on the Note and RRA retains the right to foreclose on it. That RRA may lack the specific authority to institute nonjudicial foreclosure proceedings under the DTA is an issue distinct from its general right to foreclose on the Note (e.g., through judicial foreclosure). As is the case with Section 1692d(4), Section 1692e(5) cannot serve as a source of FDCPA liability for standard notices facilitating nonjudicial foreclosure proceedings because security enforcers are not acting as debt collectors outside of Section 1692f(6).

### (iii) Waived Fees and Interest

Marquez Vargas last points to a 21-month gap in the loan history summaries as evidence that Bank of America or Countrywide Home Loans "charged-off" the Note "before Real Time appeared in late 2012 and well before RRA CP came into existence." Dkt. No. 42 at 16; *see* Dkt. No. 42-1 at 8 (Bank of America loan summary, last transaction entry on 2/18/2011); *id.* at 14 (Real Time loan summary, first transaction entry on November 6, 2012).[15] According to Marquez

---

[15] A "charge-off" is defined as "a declaration by a creditor that an amount is unlikely to be collected." *Gonzalez v. Specialized Loan Servicing LLC*, No. 1:20-CV-0159-AWI-BAM, 2020 WL 2992175, at *5 (E.D. Cal. June 4, 2020) (cleaned up); *see also McKay v. Experian Info. Sols., Inc.*, No. 6:21-CV-00371-MK, 2021 WL 9348812, at *1 (D. Or. Nov. 16, 2021) ("[A] 'charge off' is a notation that a creditor has 'changed the outstanding debt from a receivable to

Vargas, "[a] predecessor's charge-off and waiver of the right to collect interest bars subsequent successors from charging interest and fees." Dkt. No. 42 at 16. Real Time, so the argument goes, "violated the FDCPA by collecting fees and interest knowingly waived by the original creditor seller." *Id.*; *see also, e.g.*, *id.* at 18 (alleging that Defendants violated Section 1692e "by claiming that RRA CP was entitled to collect 8.25% interest from Plaintiff in the notice of foreclosure, and 7% interest in the payoff statement, when no interest was due"); *id.* at 20 ("Defendants Real Time and North Star also falsely represented to the general public that RRA CP was entitled to claim 8.5% interest when it was not due any interest at all."). Marquez Vargas cites to 12 C.F.R. §§ 1026.5(b)(2)(i) and 1026.7 in support of this argument. *Id.* at 17; *see* Dkt. No. 31 at 18 ("Defendant's actions in seeking . . . payment from the Plaintiff on amounts not owed by collecting interest and fees after failing to send statements in violation of 12 C.F.R. § 1026.5(b)(2)(i) . . . is a false and misleading communication used to collect debt in violation of 15 U.S.C. § 1692e, e(10), and e(2)(A).").

The federal regulation on which Marquez Vargas relies is part of "Regulation Z"—a subset of rules promulgated by the Consumer Financial Protection Bureau to facilitate compliance with the Truth and Lending Act ("TILA"). *See Dinucci v. Onpoint Cmty. Credit Union*, No. 3:21-CV-00122-AC, 2021 WL 5227080, at *2–3 (D. Or. Aug. 16, 2021). His reading of that regulation goes a step too far. Regulation Z imposes a general periodic statement requirement on creditors while

---

a loss in its own account books.'" (quoting *In re Anderson*, 884 F.3d 382, 385 (2d Cir. 2018))). Although the charge is considered uncollectable by the original lender, the debt is still valid. *Gonzalez*, 2020 WL 2992175, at *5 ("That is, a loan that is 'charged off' may still be legally collected upon."); *see also Frost v. Resurgent Cap. Servs., L.P.*, No. 5:15-CV-03987-EJD, 2016 WL 3479087, at *1 n.1 (N.D. Cal. June 27, 2016) (defining and discussing "charge off"); *Hanks v. Talbots Classics Nat'l Bank*, No. C12-2612-SI, 2012 WL 3236323, at *1 n.2 (N.D. Cal. Aug. 6, 2012) (same). In accordance with federal regulations, creditors typically charge off debt that has been delinquent for over 120 or 180 days (depending on whether it is an installment loan or revolving credit account, respectively), glean a tax benefit from doing so, and then sell the debt to another creditor. *See Williams v. Equifax Info. Servs., LLC*, No. CV18-02457-JAK-SHKx, 2019 WL 3243737, at *4 n.3 (C.D. Cal. May 6, 2019); *Artemov v. TransUnion, LLC*, No. 20-CV-1892-BMC, 2020 WL 5211068, at *3–4 (E.D.N.Y. Sept. 1, 2020); *see also, e.g.*, *Grochowski v. Daniel N. Gordon, P.C.*, No. C13-343-TSZ, 2014 WL 1516586, at *1 (W.D. Wash. Apr. 17, 2014).

ORDER GRANTING IN PART, DEFERRING IN PART, AND DENYING IN PART MOTION TO DISMISS, GRANTING IN PART AND DENYING IN PART MOTION TO CERTIFY, AND DENYING TRO - 27

also establishing four scenarios under which they are released from that obligation:

> The creditor shall mail or deliver a periodic statement as required by § 1026.7 for each billing cycle at the end of which an account has a debit or credit balance of more than $1 or on which a finance charge has been imposed. A periodic statement need not be sent for an account if the creditor deems it uncollectable, if delinquency collection proceedings have been instituted, *if the creditor has charged off the account in accordance with loan-loss provisions and will not charge any additional fees or interest on the account*, or if furnishing the statement would violate Federal law.

12 C.F.R. § 1026.5(b)(2)(i) (emphasis added); *see also* Dkt. No. 42-1 at 17 (Section 4.B. of the Note implementing this obligation). Nothing in this language purports to charge off debt whenever a creditor fails to issue a monthly statement. Nor does the regulation function to bar or "waive" future recovery of interest or other fees in such a situation. *See Bunce v. Portfolio Recovery Assocs., LLC*, No. 14-2149-JTM, 2014 WL 5849252, at *2 (D. Kan. Nov. 12, 2014).[16]

The Court nonetheless acknowledges that federal regulations require creditors to charge off debt after 180 days of delinquency at the latest. *See Williams*, 2019 WL 3243737, at *4 n.3; *McKay*, 2021 WL 9348812, at *3. Although Defendants question the significance of whether the Note was ever charged off, they seem to suggest that it was not. Dkt. No. 27 at 27 & n.9; Dkt. No. 46 at 16; *see* Dkt. No. 27-2 at 2 ("RTR's records do not indicate that the Account was 'Charged-Off.'"). The Court cannot resolve that factual dispute at the dismissal stage. Viewing the facts in the light most favorable to Marquez Vargas, the Court concludes that the 21-month gap between the Bank of America and Real Time loan histories is sufficient to create an inference that the Note was in fact charged off at some point. If Marquez Vargas made his last payment in February 2011,

---

[16] If anything, Marquez Vargas states a TILA violation for failure to issue periodic statements between February 2011 and November 2012. The problem is that Real Time did not service the account during that window—nor did any of the named Defendants. And to the extent a TILA violation can form the basis of an FDCPA claim, *see Novobilski v. Specialized Loan Servicing, LLC*, No. 2:22-CV-00147-MEMF-MAR, 2022 WL 3566812, at *11 (C.D. Cal. Aug. 16, 2022) (plaintiff sufficiently alleged FDCPA claim based on TILA violation, which was in turn based on defendant's failure to provide monthly mortgage statements), any FDCPA claim centered on omissions that occurred between February 2011 and November 2012 is time-barred under the applicable one-year statute of limitations, *see* 15 U.S.C. § 1692k(d).

federal regulations would have required Bank of America to charge off the debt, at the latest, sometime in September 2011 (roughly 180 days after the March 2011 payment was due).

But the mere fact that the Note was charged off (assuming without deciding that it was) does not mean that Bank of America or its successors "waived" collection of fees and interest. *See Grochowski*, 2014 WL 1516586, at *3 & n.2 (charge off did not operate to waive interest at the state statutory rate); *Frost*, 2016 WL 3479087, at *2–3 (charge off did not waive ability to collect interest under state law). Waiver is "the intentional and voluntary relinquishment of a known right." *Jones v. Best*, 950 P.2d 1, 6 (Wash. 1998). In Washington, "waiver may be either express or implied; an express waiver is governed by its own terms, while implied waiver may be found based on conduct conclusively establishing intent to waive a right." *Matter of Est. of Petelle*, 462 P.3d 848, 850 (Wash. 2020). Implied waiver requires "unequivocal acts or conduct evidencing an intent to waive" because "waiver will not be inferred from doubtful or ambiguous factors." *Cent. Wash. Bank v. Mendelson-Zeller, Inc.*, 779 P.2d 697, 701 (Wash. 1989); *Wagner v. Wagner*, 621 P.2d 1279, 1283–84 (Wash. 1980) ("It is necessary that the person against whom waiver is claimed have intended to relinquish the right, advantage, or benefit and his action must be inconsistent with any other intent than to waive it."). The party claiming waiver bears the burden of proving it. *Jones*, 950 P.2d at 6.

Given this high standard, the weight of authority suggests that charge off alone does not constitute implied waiver because it is required under the federal regulations, i.e., it is not an intentional and voluntary relinquishment of the right to seek fees and interest. *Compare Bunce*, 2014 WL 5849252, at *2 (charging off delinquent account pursuant to federal regulations was not a voluntary action, and the absence of monthly statements did not evince an intent to waive the collection of interest), *Artemov*, 2020 WL 5211068, at *3 (charging off debt is not a voluntary act because, under federal regulations, creditors have no choice in the matter), *and Wilder v. J.C.*

*Christensen & Assocs., Inc.*, No. 16-CV-1979, 2016 WL 7104283, at *5 (N.D. Ill. Dec. 6, 2016) (charge off was not evidence of waiver because it was not a voluntary action taken by creditor), *with Aldaya v. Encore Cap. Grp., Inc.*, No. 15-00284-SOM/RLP, 2017 WL 1055961, at *6 (D. Haw. Mar. 20, 2017) (distinguishing *Bunce* because plaintiff alleged that defendant had a "standard practice" and "business reasons" for charging off account, which suggested an intentional waiver of interest).

Waiver, however, can be found when a significant amount of time passes between the charge off and subsequent attempts to collect interest and other fees. *See Wilder*, 2016 WL 7104283, at *6 (collecting cases in which FDCPA claims survived dismissal because creditors failed to collect interest or send billing statements for periods ranging from five months to over two years after charge off). The Court cannot determine at this stage whether Bank of America charged off the Note or, if it did, whether the ensuing gap between statements amounts to an implied waiver of fees and interest. If it did waive fees and interest, a portion of the amount Defendants claim is due on the Note is not permitted by law. *See Morse Electro Prods. Corp. v. Beneficial Indus. Loan Co.*, 579 P.2d 1341, 1342 (Wash. 1978) (an assignee "acquires no right in excess of what the [assignor] had to transfer"). To the extent Marquez Vargas can point to communications that seek to recover allegedly waived fees or interest (other than antecedent notices or actions taken to facilitate nonjudicial foreclosure), and so long as those communications postdate October 11, 2021 (one year before suit was filed, *see* 15 U.S.C. § 1692k(d)), his claims under Sections 1692e, 1692e(2)(A), 1692e(10), 1692f, and 1692f(1) survive the dismissal stage. *See* Dkt. No. 42 at 11.

### (c) CPA Claims

Marquez Vargas brings a handful of per se CPA claims predicated on alleged violations of the WCAA. Dkt. No. 42 at 21–23. He also asserts several standalone CPA claims based on other

allegedly unfair or deceptive acts, including unauthorized initiation of nonjudicial foreclosure proceedings. *Id.* at 23–25. Defendants counter that these claims fail "[f]or the same reasons that the [c]omplaint fails to state a cause of action under the FDCPA[.]" Dkt. No. 27 at 28; *accord* Dkt. No. 46 at 16.

A CPA claim "may be predicated upon a per se violation of statute, an act or practice that has the capacity to deceive substantial portions of the public, or an unfair or deceptive act or practice not regulated by statute but in violation of public interest." *Klem*, 295 P.3d at 1187. To establish a CPA claim, a plaintiff must show (1) an unfair or deceptive act or practice, (2) in trade or commerce, (3) impacting the public interest, (4) an injury to his or her property, and (5) legal causation. *Hangman Ridge Training Stables, Inc. v. Safeco Title Ins. Co.*, 719 P.2d 531, 533 (Wash. 1986). Failure to satisfy one element is fatal. *Young v. Toyota Motor Sales, U.S.A.*, 442 P.3d 5, 9 (Wash. Ct. App. 2019).

(i)  Per Se CPA Claims – WCAA Violations

The WCAA is Washington's counterpart to the FDCPA. *Panag v. Farmers Ins. Co.*, 204 P.3d 885, 897 (Wash. 2009). It does not, however, provide a cause of action and must instead be enforced solely through the CPA. *Brown v. Transworld Sys. Inc.*, 646 F. Supp. 3d 1328, 1345 (W.D. Wash. 2022). "Certain elements of a CPA claim are deemed satisfied 'per se' based on violation of another statute." *Keodalah v. Allstate Ins. Co.*, 449 P.3d 1040, 1047 (Wash. 2019). The WCAA declares that violations of Sections 19.16.110, 19.16.250, and 19.60.260 are "unfair acts or practices or unfair methods of competition in the conduct of trade or commerce for the purpose of the application of the consumer protection act"—i.e., a predicate WCAA violation satisfies the first two *Hangman Ridge* elements. Wash. Rev. Code § 19.16.440; *Scott v. Am. Express Nat'l Bank*, 514 P.3d 695, 703 (Wash. Ct. App. 2022).

The Court finds that Marquez Vargas has established the first three elements of a CPA

claim for each alleged WCAA violation that survives dismissal. Section 19.16.440's directive satisfies the first two elements, and Marquez Vargas' allegations plausibly establish the third. *See Panag*, 204 P.3d at 897 (the business of debt collection affects the public interest). Indeed, he claims that Defendants' actions "are likely to be repeated further, as illustrated by, among other things, similar conduct toward hundreds of other alleged debtors in Washington." Dkt. No. 42 at 24; *see Eng*, 500 P.3d at 181 (allegation that defendant regularly attempted to collect third-party debts using similar practices was sufficient to plead public interest element); Wash. Rev. Code § 19.86.093(3) (a claimant may establish that an act or practice is injurious to the public interest because it injured other persons, had the capacity to injure other persons, or has the capacity to injure other persons).

The Court now turns to the asserted WCAA violations.

### a. Section 19.16.110

Marquez Vargas first claims that RRA violated Section 19.16.110 by "operating as a collection agency in Washington without being licensed as required by law[.]" Dkt. No. 42 at 22. The WCAA states that "[n]o person shall act, assume to act, or advertise as a collection agency or out-of-state collection agency as defined in this chapter, except as authorized by this chapter, without first having applied for and obtained a license from the director." Wash. Rev. Code § 19.16.110.[17] The statute defines a "collection agency" to include "a debt buyer," which in turn encompasses "any person or entity that is engaged in the business of purchasing delinquent or charged off claims for collection purposes, whether it collects the claims itself or hires a third party for collection or an attorney for litigation in order to collect such claims." Wash. Rev. Code §§ 19.16.100(4)(d), (7); *see* Dkt. No. 42 at 3 (alleging that RRA meets the definition of "debt

---

[17] A "person" includes any "individual, firm, partnership, trust, joint venture, association, or corporation." Wash. Rev. Code § 19.16.100(13).

ORDER GRANTING IN PART, DEFERRING IN PART, AND DENYING IN PART MOTION TO DISMISS, GRANTING IN PART AND DENYING IN PART MOTION TO CERTIFY, AND DENYING TRO - 32

1   buyer"); *id.* at 22 ("RRA CP is a debt buyer who is required to be a licensed collection agency but

2   it is unlicensed.").[18]

3          Defendants do not dispute that RRA qualifies as a "collection agency." Nor do they contend

4   that RRA is properly licensed with the director as required by the statute. Dkt. No. 27 at 28. Instead,

5   they appear to claim that (1) RRA was not required to obtain a license before purchasing the Note

6   and (2) regardless, the four-year limitations period has run on any CPA action based on the failure

7   to obtain a license (because RRA purchased the Note in 2016). *Id.*; *see* Wash. Rev. Code

8   § 19.86.120. But RRA's activity in this case is not limited to purchasing the Note; it also initiated

9   nonjudicial foreclosure proceedings—activity that occurred within the four-year limitations period

10   for CPA claims. *See Obduskey*, 139 S. Ct. at 1036–37 (nonjudicial foreclosure is an indirect

11   attempt to collect debt); *Diaz v. N. Star Tr., LLC*, 481 P.3d 557, 569 (Wash. Ct. App. 2021)

12   (foreclosure activities constituted debt collection). Because the legality of this activity depends on

13   the answer to the certified questions, the Court defers its determination regarding this portion of

14   Marquez Vargas' CPA claim.

15          Marquez Vargas also cites Section 19.16.260(1)(a) with respect to RRA's allegedly

16   unlawful conduct but provides no allegations specific to that statutory proscription. Section

17   19.16.260(1)(a) prohibits collection agencies and out-of-state collection agencies from "bring[ing]

18   or maintain[ing] an action in any court of this state involving the collection of its own claim or a

19

20   ---

[18] Marquez Vargas alleges elsewhere in his complaint that RRA "meets the definition of an out of state collection agency[.]" Dkt. No. 42 at 2. The WCAA defines an "out-of-state collection agency" as follows:

21       a person whose activities within this state are limited to collecting debts from debtors located in this
        state by means of interstate communications . . . from the person's location in another state on behalf
        of clients located outside of this state, but does not include any person who is excluded from the

22       definition of the term 'debt collector' under the federal fair debt collection practices act (15 U.S.C.
        § 1692a(6)).

23   Wash. Rev. Code § 19.16.100(12). RRA does not meet this definition, at least based on the facts alleged in the
    complaint, because its Washington activities are not limited to debt collection "on behalf of clients" located in other

24   states. It owns the Note and seeks to collect the debt on its own behalf. *See* Dkt. No. 27-2 at 42 (June 2016 bill of
    sale).

claim of any third party without alleging and proving that he, she, or it is duly licensed under this chapter and has satisfied the bonding requirements hereof, if applicable." Marquez Vargas fails to state a violation of this statute because RRA did not bring an action in any court with respect to the Note. It instituted *non*judicial foreclosure proceedings under the DTA. This portion of his claim is accordingly dismissed.

### b.   Section 19.16.250

Next, Marquez Vargas asserts violations of Sections 19.16.250(15), (16), (21), and (23). Dkt. No. 42 at 21–23. Although he at times limits the allegations to Real Time, he occasionally includes RRA or otherwise fails to specify which of the two defendants committed the violation at issue. The distinction is critical because Section 19.16.250 applies only to licensees or employees of licensees. And, as noted above, Marquez Vargas alleges that RRA is not a licensed collection agency. This precludes RRA's liability under Section 19.16.250. *See Moritz v. Daniel N. Gordon, P.C.*, 895 F. Supp. 2d 1097, 1113 (W.D. Wash. 2012). As for Real Time, Marquez Vargas alleges—and Defendants do not dispute—that it is a licensed collection agency. Dkt. No. 42 at 22.[19]

Section 19.16.250(15) prohibits a licensee from representing or implying to a debtor "that the existing obligation of the debtor may be or has been increased by the addition of attorney fees, investigation fees, service fees, or any other fees or charges when in fact such fees or charges may not legally be added to the existing obligation of such debtor." As discussed above, Marquez Vargas has plausibly alleged that Bank of America charged off the Note and waived fees and interest when it failed to issue periodic statements for close to two years. He has therefore stated a

---

[19] As he did with RRA, Marquez Vargas alleges elsewhere in his complaint that Real Time is an out-of-state collection agency. *See* Dkt. No. 42 at 3; Wash. Rev. Code § 19.16.100(12). Whether RRA is properly categorized as a "collection agency" or "out-of-state collection agency" is immaterial for purposes of the Court's analysis here.

violation of Section 19.16.250(15) to the extent that fees and interest were in fact waived on the Note and Real Time nonetheless issued statements or other communications attempting to collect those amounts.

The Court further finds that he has sufficiently pleaded the injury and causation elements for a CPA claim. With respect to injury, Marquez Vargas alleges that he was harmed by Real Time's alleged violations because he "spent thousands of dollars to investigate his options" following a "futile" meeting with Real Time. Dkt. No. 42 at 10; *see also id.* at 24. This suffices for now. *See Frias v. Asset Foreclosure Servs., Inc.*, 334 P.3d 529, 538 (Wash. 2014) (en banc) (injury element can be met even when the alleged injury "is both minimal and temporary"; a consumer can claim injury for expenses incurred in responding to demands for payment); *Panag*, 204 P.3d at 902 (consulting attorney to dispel uncertainty regarding the nature of alleged debt is sufficient injury); *Kosovan v. Omni Ins. Co.*, 496 P.3d 347, 366 (Wash. Ct. App. 2021). Marquez Vargas' allegations also plausibly establish causation. *See Top Notch Sols., Inc. v. Crouse & Assocs. Ins. Brokers, Inc.*, No. C17-827-TSZ, 2017 WL 5158525, at *4 (W.D. Wash. Nov. 7, 2017) (if defendant needed a license to engage in the debt collection activities alleged in the complaint, then his violation of the licensing provision is considered the "but for" cause of any injury that plaintiffs suffered from those debt collection activities). Defendants' motion to dismiss is denied as to this claim.

Under Section 19.16.250(16), a licensee may not "[t]hreaten to take any action against the debtor which the licensee cannot legally take at the time the threat is made." Marquez Vargas contends that Real Time violated this prohibition by "sending [him] monthly statements when there was no debt due[.]" Dkt. No. 42 at 23. However, as the Court has explained, the Note debt is not time-barred. Real time thus did not violate Section 19.16.250(16) by sending Marquez Vargas monthly statements. This claim is dismissed.

Section 19.16.250(21) forbids licensees from "[c]ollect[ing] or attempt[ing] to collect in addition to the principal amount of a claim any sum other than allowable interest, collection costs or handling fees expressly authorized by statute[.]" As discussed above, Marquez Vargas has plausibly alleged that Bank of America charged off the Note and waived fees and interest when it failed to issue periodic statements for close to two years. He has therefore stated a violation of Section 19.16.250(21) to the extent that fees and interest were in fact waived on the Note and Real Time nonetheless issued statements or other communications attempting to collect those amounts. *See* Dkt. No. 42 at 23 (claiming that post-charge off monthly statements included fees and interest not allowed by law). The Court further finds that he has sufficiently pleaded the injury and causation elements for a CPA claim. *See Frias*, 334 P.3d at 538; *Panag*, 204 P.3d at 902. Defendants' motion to dismiss is denied as to this claim.

Last, Section 19.16.250(23) imposes liability on licensees for "[b]ring[ing] an action or intiat[ing] an arbitration proceeding on a claim when the licensee knows, or reasonably should know, that such suit or arbitration is barred by the applicable statute of limitations." This, too, is premised on the flawed notion that the debt is time-barred. It is not. And because Real Time neither brought an action nor initiated an arbitration proceeding (Defendants initiated *non*judicial foreclosure proceedings), this claim fails as a matter of law.

### (ii) Standalone CPA Claims

Marquez Vargas points to several allegedly unfair or deceptive actions in support of his standalone CPA claims. These allegations generally fall into four categories. He claims that Defendants (1) attempted to collect time-barred debt; (2) attempted to enforce a non-negotiable instrument (the Note) through the DTA and represented that they had the authority to do so; (3) "published inaccurate statements and default information"; and (4) issued post-charge off periodic statements that included fees and interest not permitted by law. Dkt. No. 42 at 23–24. The

1   Court dismisses the first category for the reasons discussed above, defers its ruling on the second

2   category, and finds that Marquez Vargas has sufficiently pleaded standalone CPA claims based on

3   the third and fourth category. However, the Court notes that these latter categories are duplicative

4   of his per se CPA claims based on WCAA violations. These standalone claims are therefore

5   stricken as redundant. Fed. R. Civ. P. 12(f); 2 Moore's Federal Practice § 12.37 ("[G]enerally,

6   courts will strike a claim as 'redundant' when it essentially repeats another claim in the same

7   complaint.").

8   **B.    Motion to Certify**

9           Marquez Vargas asks the Court to certify two "unanswered" issues to the Washington State

10  Supreme Court. Dkt. No. 50 at 1. First, he wants the state's high court to rule on whether a HELOC

11  agreement that "meets the federal definition of an open-ended credit plan" is an installment note

12  under Washington law. *Id.* at 2. Second, he believes that the Washington Supreme Court should

13  definitively rule on whether the possessor of a home equity line of credit agreement can use the

14  DTA's nonjudicial foreclosure procedures. *Id*. Marquez Vargas contends that "no published case

15  law directly addresses" this question. *Id.* Nor, according to him, is there caselaw for the Court to

16  consult to predict how the Washington Supreme Court would resolve this issue. *Id.* at 4; *see also*

17  *id.* at 8 ("Certification is appropriate in circumstances like these where the precedent lacks any

18  substantive analysis directly on point[.]"). The Court finds that certification is warranted only on

19  the second question.

20          1.   Standard

21          "Certification of questions of state law to the highest court of the state 'provides a means

22  to obtain authoritative answers to unclear questions of state law.'" *Micomonaco v. State of Wash.*,

23  45 F.3d 316, 322 (9th Cir. 1995) (quoting *Toner ex rel. Toner v. Lederle Laboratories*, 779 F.2d

24  1429, 1432 (9th Cir. 1986)). Thus, if state law permits it, a district court may certify a question to

ORDER GRANTING IN PART, DEFERRING IN PART, AND DENYING IN PART MOTION TO DISMISS, GRANTING IN PART AND DENYING IN PART MOTION TO CERTIFY, AND DENYING TRO - 37

the state's highest court. *High Country Paving, Inc. v. United Fire & Cas. Co.*, 14 F.4th 976, 978 (9th Cir. 2021). Washington law permits certification "[w]hen in the opinion of any federal court before whom a proceeding is pending, it is necessary to ascertain the local law of this state in order to dispose of such proceeding and the local law has not been clearly determined[.]" Wash. Rev. Code § 2.60.020. The Court, however, invokes the certification process "only after careful consideration and do[es] not do so lightly." *Kremen v. Cohen*, 325 F.3d 1035, 1037 (9th Cir. 2003). Indeed, certification is not obligatory even when state law is unclear. *Riordan v. State Farm Mut. Auto. Ins. Co.*, 589 F.3d 999, 1009 (9th Cir. 2009) (certification is not warranted merely because local law is difficult to ascertain).

The Court typically weighs four factors to determine whether certification is proper: (1) whether the question presents important public policy ramifications that are unresolved by the state court; (2) whether the issue is new, substantial, and has broad application; (3) the state court's caseload; and (4) comity and federalism. *U.S. Bank, N.A., Tr. for Holders of J.P. Morgan Mortg. Tr. 2007-S3 v. S. Highlands Cmty. Ass'n*, 999 F.3d 1185, 1187 (9th Cir. 2021). These factors are not controlling, though. And the decision to certify a question ultimately "rests in the 'sound discretion' of the district court." *Eckard Brandes, Inc. v. Riley*, 338 F.3d 1082, 1087 (9th Cir. 2003) (quoting *Louie v. United States*, 776 F.2d 819, 824 (9th Cir. 1985)).

1. <u>Issue 1 – Home Equity Loans and Installment Notes</u>

There is no doubt as to whether a HELOC agreement can be an installment note. In Washington, a written loan agreement is either a demand promissory note or an installment promissory note. *See Merceri*, 434 P.3d at 87 ("Washington law distinguishes between demand promissory notes and installment promissory notes."). The agreement is a demand note if it is mature at its inception; it is an installment note if it is payable in installments and matures on a future date. *Copper Creek*, 508 P.3d at 187. This Court has found that the Note (a HELOC

agreement) is an installment note. And the statute of limitations ran on each installment from the time it became due. *Id.* ("A separate statute of limitations accrues and runs for each individual installment.").

### 2. Issue 2 – Negotiability and the DTA

As discussed above, before a notice of trustee's sale is recorded, the DTA requires the trustee to "have proof that the beneficiary is the holder of any promissory note or other obligation secured by the deed of trust." Wash. Rev. Code § 61.24.030(7)(a). The DTA defines "beneficiary" as "the holder of the instrument or document evidencing the obligations secured by the deed of trust[.]" Wash. Rev. Code § 61.24.005(2). The crux of Marquez Vargas' theory is that RRA cannot be a "beneficiary" for purposes of the statute because it is not a "holder" as that term is defined in the WUCC; specifically, RRA cannot be a "holder" because the Note is not a "negotiable instrument." Dkt. No. 31 at 9–11; *see* Wash. Rev. Code § 62A.1-201(21)(A) (defining "holder" as "[t]he person in possession of a *negotiable instrument* that is payable either to bearer or to an identified person that is the person in possession[.]" (emphasis added)); *id.* § 62A.3-104(a) (defining "negotiable instrument"); *see also id.* §§ 62A.3-106, 62A.3-108, 62A.3-109 (further defining the elements of a "negotiable instrument").

If the HELOC is a negotiable instrument, RRA is clearly within its rights to nonjudicially foreclose under the DTA. Article 3 of the WUCC defines a "negotiable instrument" as "an unconditional promise or order to pay a fixed amount of money, with or without interest or other charges described in the promise or order," so long as three requirements are met. Wash. Rev. Code § 62A.3-104(a). The instrument (1) must be "payable to bearer or to order at the time it is issued or first comes into possession of a holder"; (2) must be "payable on demand or at a definite time"; and (3) cannot "state any other undertaking or instruction by the person promising or

ordering payment to do any act in addition to the payment of money" (with three narrow exceptions not applicable here). Wash. Rev. Code § 62A.3-104(a)(1)–(3); *see Brown*, 359 P.3d at 777 n.3.

While "most states have modeled their commercial codes after the U.C.C.," *Goodman v. Com. Bank & Tr. Co.*, 72 F.4th 122, 125 (6th Cir. 2023), courts have reached different conclusions regarding whether a HELOC is a negotiable instrument. *See, e.g.*, *Wishengrad v. Carrington Mortg. Servs.*, 529 P.3d 880, 885 (Nev. 2023) (a HELOC with a closed draw period and specified maturity date is a negotiable instrument); *Hanover v. Real Time Resols., Inc.*, No. 3:22-CV-209, 2023 WL 5585905, at *5 (S.D. Ohio Aug. 29, 2023) (a HELOC is not a negotiable instrument); *In re Ramirez Ramirez*, No. 8:18-BK-13870-CB, 2020 WL 4436263, at *8 n.6 (B.A.P. 9th Cir. Aug. 3, 2020) (a HELOC is not "an instrument within the meaning of Article 3 of the Uniform Commercial Code"); *Third Fed. Sav. & Loan Ass'n of Cleveland v. Koulouvaris*, 247 So. 3d 652, 655 (Fla. Dist. Ct. App. 2018) (a HELOC that does not require the payment of a fixed amount of money is not a negotiable instrument); *Synovus Bank v. Paczko*, No. M2014–00897-COA-R3-CV, 2015 WL 3455965, at *7 (Tenn. Ct. App. May 29, 2015) (a HELOC is not a negotiable instrument). It appears that courts in Washington have not yet addressed whether a HELOC is a negotiable instrument.

If the HELOC is not a negotiable instrument, RRA's ability to nonjudicially foreclose depends on the meaning of the DTA as applied to a nonnegotiable instrument. Although Washington State courts have repeatedly looked to the WUCC to define the terms and parameters of the DTA, *see Brown*, 359 P.3d at 777–80, 783–87; *Bain*, 285 P.3d at 41–44; *see also Bucci*, 387 P.3d at 1143–46; *Blair*, 372 P.3d at 134–35, the Court has not found any case addressing what constitutes a "holder" with respect to a "promissory note or other obligation secured by the deed of trust" other than negotiable instruments.

Because alleged "beneficiaries" have initiated, and continue to initiate, nonjudicial foreclosures under the DTA based on borrowers' defaults of HELOC agreements, *see* Chris Arnold et al., *Zombie 2nd mortgages are coming to life, threatening thousands of Americans' homes*, NPR (May 10, 2024), https://www.npr.org/2024/05/10/1197959049 (last visited August 22, 2024), these unanswered questions of law have "important public policy ramifications" and are "of broad application," *S. Highlands Cmty. Ass'n*, 999 F.3d at 1187. In the spirit of comity and federalism accorded to state courts to decide important issues of state law, *see S. Highlands Cmty. Ass'n*, 999 F.3d at 1187, the Court plans to certify these questions to the Washington State Supreme Court.

Before certifying the questions, however, the Court directs the parties to submit supplemental briefing addressing how the questions should be framed. The Court is considering the following:

- (1) Whether a typical HELOC[20] that has a closed draw period and specified maturity date is a negotiable instrument under Article 3 of the WUCC? If the Court answers this question in the affirmative, it need not address the remaining question. Alternatively, the Court may choose to answer only the latter question.

- (2) Whether an alleged beneficiary under the Deeds of Trust Act satisfies the requirement to show that it is "the holder of any promissory note or other obligation secured by the deed of trust," Wash. Rev. Code § 61.24.030(7)(a), by executing a declaration under penalty of perjury attesting that it is the holder of a HELOC agreement and by producing an initial draw acknowledgment?

---

[20] A typical HELOC provides a credit limit applicable during the draw period, during which the borrower is responsible for monthly interest-only payments, and a repayment period, during which the borrower is responsible for monthly payments including principal and interest.

ORDER GRANTING IN PART, DEFERRING IN PART, AND DENYING IN PART MOTION TO DISMISS, GRANTING IN PART AND DENYING IN PART MOTION TO CERTIFY, AND DENYING TRO - 41

For clarity's sake, the Court is not interested in additional argument on the appropriateness of certification; it seeks the parties' input only on how to best frame the certified questions. Additionally, the certified questions should not be worded in a manner that suggests a particular outcome. For this reason, the Court rejects the parties' previous proposals. Dkt. No. 50 at 2; Dkt. No. 57 at 6.

In certifying these questions, the Court plans to inform the Washington State Supreme Court that it does not intend its framing to restrict that Court's discretion to reformulate the question or consider any issues that it determines are relevant that may not be specifically identified in the questions presented. *Adamson v. Port of Bellingham*, 899 F.3d 1047, 1052 (9th Cir. 2018), *certified question answered*, 438 P.3d 522 (Wash. 2019).

## III.   CONCLUSION

For the reasons set forth above, the Court GRANTS IN PART, DENIES IN PART, and DEFERS IN PART Defendants' Motion to Dismiss, Dkt. No. 27, and GRANTS IN PART and DENIES IN PART Marquez Vargas' Motion to Certify Questions to the Washington Supreme Court, Dkt. No. 50. The Court further DENIES as moot Marquez Vargas' Motion Seeking Temporary Restraining Order and Permanent Injunction Re the Nonjudicial Foreclosure Sale of Residence. Dkt. No. 43.

The parties are ORDERED to submit supplemental briefing of no more than 2,100 words addressing the framing of the certified questions by September 12, 2024.

Dated this 29th day of August, 2024.

Lauren King
United States District Judge